# UNITED STATES DISTRICT COURT
### for the
### DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA,**

**Vs.**                                    **CASE NO.:  1:21-cr-188-RDM**


**PAUL ALLARD HODGKINS**
        **Defendant.**
_____/

### <u>AMENDED[1] SENTENCING MEMORANDUM OF<br>PAUL ALLARD HODGKINS FOR JULY 19, 2021<br>AND SUPPORTING MEMORANDUM OF LAW</u>

Now Comes Defendant, **PAUL ALLARD HODGKINS ("HODGKINS")**, files this

Sentencing Memorandum and supporting Memorandum of Law and respectfully

requests a downward variance(s) pursuant to §3553(a) and from the applicable Sentencing

Guidelines range, and as required by applicable law, and says as follows:

### <u>BACKGROUND</u>

On March 5, 2021, a federal grand jury for the District of Columbia returned a five-count

Indictment charging PAUL ALLARD HODGKINS with Obstruction of an Official Proceeding

and Aiding and Abetting, in violation of 18 USC §§ 1512(c)(2) and 2 as to Count One; Entering

and Remaining in a Restricted Building or Grounds, in violation of 18 USC §1752(a)(1) as to

Count Two; Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation

---

[1] This amended sentencing memorandum is filed to ensure that there is no confusion concerning the Defense's position as to sentencing.   Consistent with the Plea Agreement, and paragraph 7 of the PSR, the Defense makes no objection to the guidelines as set forth therein.   Any arguments contained herein are consistent with paragraph 87 of the PSR and made solely pursuant to 18 USC § 3553.   Any references contained within this sentencing memorandum as to recommended reductions in sentencing levels is made as suggested guidance only as a form of a variance under § 3553, and consistent with both the Plea Agreement (DOC 22) and the PSR (DOC 27). Clarifications are made within this memorandum as needed to ensure clarity.

of 18 USC § 1752(a)(2) as to Count Three; Disorderly Conduct in a Capitol Building, in violation of 40 USC § 5104(e)(2)(D) as to Count Four; and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 USC §5104(e)(2)(G) as to Count Five.

The Defendant, Mr. HODGKINS, was arrested on February 16, 2021.   Since the date of his arrest, Mr. HODGKINS has been working and living in Tampa with location monitoring and a curfew.   Importantly, the probation office for the Middle District of Florida who supervises defendant HODGKINS advises that the defendant has been compliant while on release.

On June 2, 2021, the Defendant pled guilty to Count One of the five-count Indictment, which charged Obstruction of an Official Proceeding, in violation of 18 USC § 1512(c)(2), and pursuant to a written plea agreement and Rule 11(c)(1)(B).   In accord with the plea agreement, the parties agree that pursuant to USSG §2J1.2, the base offense level is 14. Further,  the parties also agree that pursuant to USSG §2J1.2(b)(2), the offense level is increased by three because the offense resulted in substantial interference with the administration of justice. The government will recommend a three-level reduction for acceptance of responsibility, pursuant to USSG §3E1.1, thereby resulting in a total offense level of 14.

As noted in the PSR, Mr. HODGKINS has no prior record.  (PSR DKT#27 p.9) .  This case represents the first time Mr. HODGKINS has ever been in a criminal courtroom.   This case is the story of a man who represents all that we would want in our fellow Americans.   Law-abiding, hardworking, honest, caring, kind, thoughtful, generous, and the kind of person you would love to have for a neighbor.   It is the story of a man who for just one hour on one day, lost his bearings and his way.   It is the story of a man who made a fateful decision to follow the crowd, and found himself for approximately 15 minutes in a place that he sincerely regrets to have been.   It is the story of a man who is worthy of this Court's mercy and grace.   Paul is an

avatar of us all, and how this Court deals with his misconduct will say much about where we are and what we will become as a nation.

At all times throughout this case, Mr. HODGKINS has cooperated with law enforcement, and with every request of the Department of Justice.   It should also be noted by the Court that Mr. HODGKINS has cooperated with the United States, prior to entering this plea, by providing the United States access to all of his electronic devices, as requested.   Mr. HODGKINS understands what he has done, and offers no excuse for his actions.   Mr. HODGKINS case represents one of the first defendant's to have pled to a felony charge, to which he has accepted full and complete responsibility, (PSR DKT#27 p.9) *("The defendant has clearly demonstrated acceptance of responsibility for the offense")* and pled guilty pursuant to a plea agreement on May 31, 2021. (DKT# 22).   Given the nature of the events that took place on January 6th 2021 and their notoriety, it takes courage and strength of character to be the first person to step forward and accept judgment.   However, these are qualities and characteristics that Paul embodies.  It is these elements of character that were forged in Paul's youth, borne out in hard work that is necessary to become an Eagle Scout.[2]  In short, PAUL HODGKINS is upstanding citizen, a man of conviction and courage, and emblematic of every quality we want in our fellow Americans.  I have spent 33 years in military service, with multiple combat deployments.  I know what strength of character, honor and valor looks like.   To that end, I am honored to write on Paul's behalf, and hope that this sentencing memorandum provides this Honorable Court some insight into what a fine man will stand before her.

---

[2] Since the inception of the Eagle Scout award in 1912, 2.01 percent of eligible Scouts have earned Scouting's highest honor.  *See "Four Percent: The Story of Uncommon Youth in a Century of American Life."*

## DEFENDANT, PAUL HODGKINS ARGUMENTS
## FOR VARIANCES PURSUANT TO §3553(a)

We are a nation divided.   The events of January 6th, 2021, did not happen as an isolated event.   It was the culmination of a series of events over the past ten years that led to this outcome.[3]   We now live in a county that seeks to cancel one another.   It is the end state and the result of becoming a post-Christian society.   A nation of citizens that have yet to experience Godly grace, finds it next to impossible to give grace to each other.   The result is that we have become a nation that no longer sees one another as brothers/sisters traveling in a disjointed and fallen world in need of each other's support and generosity, but rather as potential enemies to be destroyed.  This is the lay of the land from which this Court finds itself, but our unique history provides wisdom that this Court would do well to adhere.

The divisions and strife that we see today is not the first time.  In April, 1865, the nation was mired in a four year long civil war that left between 620,000 and 750,000 soldiers dead[4],

---

[3] While the US has long been home to a vibrant protest environment, demonstrations surged to new levels in 2020. Between 24 May and 22 August, The Armed Conflict Location & Event Data Project (ACLED) records more than 10,600 demonstration events across the country. Over 10,100 of these — or nearly 95% — involve peaceful protesters. Fewer than 570 — or approximately 5% — involve demonstrators engaging in violence. Well over 80% of all demonstrations are connected to the Black Lives Matter movement or the COVID-19 pandemic.   In many local communities, protests marking Floyd's death have doubled as acts of remembrance for people like Michael Brown, Eric Garner, Freddie Gray, and Trayvon Martin — whose killing in 2012 originally sparked the BLM movement.

Starting in May 2020, demonstrations over the police killing of George Floyd were held in the city of Portland, Oregon, concurrent with protests in other cities in the United States and around the world. By July 2020, many of the protests, which had been held virtually every day since, have turned violent.   Many of these protests centered around the Federal Courthouse, and ICE facilities.

During the Justice Brett Kavanaugh Supreme Court nomination hearings, at least 227 demonstrators were arrested between the start of the nomination hearings through the end of testimony three days later, according to the U.S. Capitol Police. Most of those arrested were charged with disorderly conduct, crowding or obstructing, and paid fines of $35 or $50.

[4] The Civil War was America's bloodiest conflict.  The unprecedented violence of battles such as Shiloh, Antietam, Stones River, and Gettysburg shocked citizens and international observers alike.  Nearly as many men died in captivity during the Civil War as were killed in the whole of the Vietnam War.  Hundreds of thousands died of disease.  Roughly 2% of the population, an estimated 620,000 men, lost their lives in the line of duty.  Taken as a

along with an undetermined number of civilians, and one that would claim the life of President Lincoln, who was assassinated just five days after Lee's surrender.   In the spring, 1865, President Lincoln was facing the complex decision of how to heal a nation that was hopelessly divided, devasted and large parts of which were utterly destroyed.

Lincoln presided over the nation's most terrible crisis. The Civil War began one month after he took office and ended 5 days before he died.  It was more bitter and protracted than anyone had predicted.  In Lincoln's second inaugural address, delivered just over a month before his death, he spoke about the war as he had come to understand it.  In the speech's closing, with the immortal words of reconciliation and healing that are carved in the walls of the Lincoln Memorial just one mile from where this Court stands, he set the tone for his plan for the nation's Reconstruction and healing.[5]

> With malice toward none; with charity for all; with firmness in the right, as God gives us to see the right, let us strive on to finish the work we are in; to bind up the nation's wounds; to care for him who shall have borne the battle, and for his widow, and his orphan—to do all which may achieve and cherish a just, and a lasting peace, among ourselves, and with all nations.[6]

As history bore out, Lincoln was never able to heal the nation with "*malice toward none; charity for all.*"[7]  He was murdered at the hands of John Wilkes Booth, and the radical

---

percentage of today's population, the toll would have risen as high as 6 million souls.

[5]  In a letter to Thurlow Weed, written during the final weeks of the Civil War, Lincoln stated that his Second Inaugural Address would not be "immediately popular," with its inclusive message and refusal to lay blame. The letter is also a rare declaration of Lincoln's faith in God.

[6] Just 701 words long, Lincoln's Second Inaugural Address took only six or seven minutes to deliver, yet contains many of the most memorable phrases in American political oratory. The speech contained neither gloating nor rejoicing. Rather, it offered Lincoln's most profound reflections on the causes and meaning of the war.

[7]  Lincoln's second inaugural address, given on March 4, 1965, would precede his death by a mere 40 days.   With its biblical allusions, alliteration, repetition, and parallel structure, and its reliance on one-syllable words, the address has the power of a sermon. It incorporates many of the themes of the religious revivals: sin, sacrifice, and redemption.   The Defendant would ask the Court to consider this last attribute, "redemption", when assessing a proper sentence.

reconstruction of the South led to 100 years of racial animosity and injustice, that was not addressed until the Civil Rights Act of 1964.   The vengeance and malice of reconstruction as a result of Lincoln's death led to harsh feelings, harsh outcomes, and bitterness that divided the country along racial and regional lines.   Today, the country is as divided as it was in the 1850's.[8] But today, this Court has a chance to make a difference.  The Court has a chance to emulate Lincoln.  We have the chance to be as Lincoln had hoped, to exercise grace and charity, and to restore healing for those who seek forgiveness.   Alternatively, we can follow the mistakes of our past: to be harsh, seek vengeance, retribution, and revenge, and continue to watch the nation go down its present regrettable path.   How this Court deals with PAUL HODGKINS can stand as a symbol of what we are and, in the event, "charity" is given, what President Lincoln hoped we would always be:  A nation that forgives, gives undeserved grace, and restoration that promotes healing.

## **SENTENCING FACTORS**

As a result of the Supreme Court's decision in <u>United States v. Booker</u>, 543 U.S. 220 (2005), sentencing courts are no longer constrained solely by the federal sentencing guidelines and must now consider each of the factors enumerated in 18 U.S.C. § 3553(a) to fashion an appropriate sentence. An appropriate sentence is one that is "sufficient, but not greater than necessary" to comply with the purposes set forth in 18 U.S.C. § 3553(a) (2). <u>Kimbrough v. United States</u>, 552 U.S. 85, 101 (2007). The advisory sentencing guideline range is but one of many relevant factors in the sentencing court's determination of an appropriate sentence. 18 U.SC. § 3553(a).

---

[8] As borne out by the divisive media coverage (in some forums) of the events surrounding the January 6, 2021 demonstration, and this sentencing memorandum.

### 1. Sentencing under *Booker*

In *United States v. Booker*, 125 S. Ct. 738, 756 (2005), the Supreme Court, reaffirming its

holding *Apprendi v. New Jersey*, 530 U.S. 466 (2000), concluded that the provisions of the

Federal Sentencing Reform Act of 1984 were not to be applied as though they were mandatory,

essentially making the guidelines advisory. *Id.* at 757.   Therefore, instead of being bound by the

Sentencing Guidelines, the Sentencing Reform Act, as being revised by *Booker*:

> [R]equires a sentencing court to consider Guidelines ranges, see U.S.C.A.
> 3553(a)(4)(Supp. 2004), but it permits the court to tailor the sentence in light of
> other statutory concerns, as well. See 3553(a).

> *Booke*r, 125 S. Ct. at 757.

Therefore, under *Booker*, sentencing courts must treat the sentencing guidelines as just

one of a number of sentencing factors that are otherwise set forth in 18 U.S.C. 3553(a).   The

primary directive in Section 3553(a) is for sentencing courts to impose a sentence sufficient, but

not greater than necessary, to comply with the purposes set forth in paragraph 2 of the section.

### 2. Relevant Sentencing Factors Under 18 U.S.C. § 3553

In determining the minimally sufficient sentence, 3553(a) further directs sentencing

courts to consider the following factors, inter alia:

> (1) the nature and circumstances of the offense and the history and characteristics of the
> defendant;

> (2) the need for the sentence imposed – (A) to reflect the seriousness of the offense, to
> promote respect for the law, and to provide just punishment for the offense; (B) to afford
> adequate deterrence to criminal conduct; (C) to protect the public from further crimes of
> the defendant; and (D) to provide the defendant with needed educational or vocational
> training, medical care, or other correctional treatment in the most effective manner;

> (3) the kinds of sentences available;

> (4) the applicable Sentencing Guidelines; . . .

> (5) any pertinent Sentencing Guidelines policy statement . . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

For the factual basis and sentencing guidelines calculation, please see the Presentence Investigation Report ((PSR DKT# 27).  Additionally, post *Booker*, this Court can fashion any sentence that is sufficient to comply with the purposes set forth 18 U.S.C. 3553(A) (2) and discussed above.

In addition to the sentencing factors mentioned above, the Court should also consider that the PAUL HODGKINS has voluntarily pled guilty and by doing so, saved the taxpayer the costs of excessive litigation, and conserved a substantial number of judicial resources during a time where the COVID 19 pandemic has placed great stress upon the system.   This acceptance of responsibility should be considered as the Defendant essentially voluntarily disclosing to the offenses brought to his attention.  In that respect, the Defendant would be eligible for variance consistent with  §3553 and IAW section 5K2.16, *Voluntary Disclosure of Offense.*

Furthermore, other statutory sections also give the district Court guidance in sentencing. For example, 18 U.S.C. 3582 provides that the imposition of a term of imprisonment is subject to the following limitation: "in determining whether and to what extent imprisonment is appropriate based on the Section 3553(a) factors, the judge is required to recognize that imprisonment is *not* an appropriate means of promoting correction and rehabilitation." (Emphasis added).

In accordance with 18 U.S.C. 3661, *no limitation* shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence (emphasis added).  This includes as relevant to sentencing a variety of factors such as the

defendants age, educational and vocational skills, mental and emotional conditions, drug or alcohol dependence, and lack of guidance as a youth.  *See* U.S.S.G. 5H1.  See also *United States v. Nellum*, 2005 WL 300073, 2005 U.S. Dist. LEXIS 1568 (N.D. Ind. Feb. 3, 2005) (Simon, J.) (taking into account fact that defendant, who was 57 at sentencing, would upon his release from prison have a very low likelihood of recidivism since recidivism reduces with age; citing Report of the U.S. Sentencing Commission, Measuring Recidivism: the Criminal History Computation of the Federal Sentencing Guidelines, May 2004); *United States v. Naylor*, __ F. Supp. 2d __, 2005 WL 525409, *2, 2005 U.S. Dist. LEXIS 3418 (W.D. Va. Mar. 7, 2005) (Jones, J.) (concluding that a sentence below career offender guideline range was reasonable in part because of defendants youth when he committed his predicate offenses he was 17 and noting that in *Roper v. Simmons,* 125 S. Ct. 1183, 1194-96 (2005), the Supreme Court found significant differences in moral responsibility for crime between adults and juveniles).

The directives of *Booker* and 3553(a) make clear that courts may no longer uncritically apply the guidelines.  Such an approach would be inconsistent with the holdings of the merits majority in *Booker*, rejecting mandatory guideline sentences based on judicial fact-finding, and the remedial majority in *Booker*, directing courts to consider all of the 3353(a) factors, many of which the guidelines either reject or ignore.  *United States v. Ranum*, 353 F. Supp. 2d 984, 985-86 (E.D. Wisc. Jan. 19, 2005) (Adelman, J.).  As another district court judge has correctly observed, any approach which automatically gives heavy weight to the guideline range comes perilously close to the mandatory regime found to be constitutionally infirm in *Booker*.  *United States v. Jaber*, __ F. Supp. 2d __, 2005 WL 605787 *4 (D. Mass. March 16, 2005) (Gertner, J.). See also *United States v. Ameline*, 400 F.3d 646, 655-56 (9th Cir. Feb. 9, 2005) (advisory guideline range is only one of many factors that a sentencing judge must consider in determining

an appropriate individualized sentence), *rhg en banc granted*, 401 F.3d 1007 (9th Cir. 2005).

Justice Scalia explains the point well in his dissent from *Booker's* remedial holding:

> Thus, logic compels the conclusion that the sentencing judge, after considering the recited factors (including the guidelines), has full discretion, as full as what he possessed before the Act was passed, to sentence anywhere within the statutory range.  If the majority thought otherwise if it thought the Guidelines not only had to be considered (as the amputated statute requires) but had generally to be followed its opinion would surely say so.

> *Booker*, 125 S. Ct. at 791 (Scalia, J., dissenting in part).

Likewise, if the remedial majority thought the guidelines had to be given heavy weight, its opinion would have said so.  The remedial majority clearly understood that giving any special weight to the guideline range relative to the other Section 3553(a) factors would violate the Sixth Amendment.

In sum, in every case a sentencing court must now consider <u>all</u> of the 3553(a) factors, not just the guidelines, in determining a sentence that is sufficient but not greater than necessary to meet the goals of sentencing.  And where the guidelines conflict with other sentencing factors set forth in 3553(a), these statutory sentencing factors should generally trump the guidelines.  <u>See</u> <u>United States v. Denardi</u>, 892 F.2d 269, 276-77 (3d Cir. 1989) (Becker, J, concurring in part, dissenting in part) (arguing that since 3553(a) requires a sentence be no greater than necessary to meet four purposes of sentencing, imposition of a sentence greater than necessary to meet those purposes violates statute and is reversible, even if within guideline range).

**A.  <u>A variance under §3553(a)(1)  is Warranted Utilizing the Factors under U.S.S.G. § 3B1.2; and also see U.S.S.G. § 2D1.1 (b) (18).</u>**

Under §3553(a)(1) (the nature and circumstances of the offense), the Court may consider a variance if the Court considers that Mr. HODGKINS participation in the January 6, 2021 disturbance was minimal.

Given the number of individuals who have been charged with criminal offenses related to the January 6th 2021 disturbance outside and within the United States Capitol, and the activities of those who engaged in planned violence, Mr. HODGKINS role within the larger events was absolutely minimal.  We believe this Court should consider a recommended variance utilizing the factors under U.S.S.G. § 3B1.2 of  what would normally be a four (4) level reduction for a Defendant being found to be a minimal participant in the events concerning what transpired on January 6th, 2021 under §3553(a)(1).   The facts of this case are not under dispute.   This defendant meets the book definition of someone who had an absolutely miniscule, let alone, minimal role in accordance with U.S.S.G § 3B1.2. [9]  Mr. HODGKINS was not involved in any way, shape or form, with violence toward anyone in law enforcement.   Mr. HODGKINS was not involved in any way, shape or form with any property damage done to the Capitol.   Mr. HODGKINS never touched a single item within the Capitol building itself.  His sole participation simply included walking into the building, onto the floor of the United States Senate, and leaving the same building, all within a 15-minute period of time.

For purposes of findings, one can understand the logic behind Mr. HODGKINS having to accept a felony offense for being on the floor of the Senate, as compared to others similarly situated who were found inside the Rotunda or other places within the Capitol building.   But for

---

[9] In November 2015, the Commission added the following language to Application Note 3(C) for § 3B1.2: In determining whether [a defendant warrants a minimal or minor participant]  or  an  intermediate adjustment,  the  Court  should  consider  the following non-exhaustive list of factors:

    (i)  the degree to which the defendant understood the scope and structure of the criminal activity;

    (ii)  the degree to which the defendant participated in planning or organizing the criminal activity;

    (iii) the degree to which the defendant exercised decision- making authority or influenced the exercise of decision- making authority;

    (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;

    (v)   the degree to which the defendant stood to benefit from the criminal activity.

sentencing purposes, there is zero difference between those who have been offered misdemeanor offenses, and the actions of Mr. HODGKINS.   In point of fact, because Mr. HODGKINS has accepted responsibility for a felony offense, he has been punished far more than those who did the same exact things of which he is accused (entering the Capitol building without permission while Congress was in session).   Because Mr. HODGKINS is now a convicted felon for the entirety of his life, he loses his right to bear arms, his right to vote in the State of Florida, will have to register as a convicted felon wherever he lives, will lose the ability to rent a residence at most locations who do background checks, and based on the plea deal before this Court, will pay restitution four times higher than those in the Capitol who stood in other locations, inter alia.

The determination as to whether to apply subsection (a) or subsection (b), or an intermediate adjustment, is based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case.  In determining whether to apply subsection (a) or (b), or an intermediate adjustment, the Court should consider the following non-exhaustive list of factors:

(i) the degree to which the defendant understood the scope and structure of the criminal activity;  Mr. HODGKINS took a bus to Washington, alone.   He attended the rally and made his way to the Capitol building with the crowd.   Mr. HODGKINS was in Washington by himself, and was not involved with any other person.    In the instant case, the Defendant sole involvement was walking into the Capitol an hour after the Congress had recessed, and following the crowd. Mr. HODGKINS did not interfere with law enforcement, and had no direct contact with anyone in law enforcement.  Mr. HODGKINS did not touch anything inside the Capitol, nor did he damage any property whatsoever.  Further, Mr. HODGKINS did not go onto social media to brag about his involvement in the events surrounding January 6, 2021.   When contacted by law

enforcement, he fully cooperated.   When indicted, he immediately sought to accept full responsibility for his actions.

(ii) the degree to which the defendant participated in planning or organizing the criminal activity;  There is no evidence whatsoever that Mr. HODGKINS was involved in organizing or planning any activities with respect to any events that transpired on January 6th, 2021.

(iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;  As stated in the PSR, the Defendant had no decision-making authority in regards to the demonstration and the subsequent unrest related to the activities surrounding the United States Capitol.

(iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; The PSR makes clear that the Defendant did not engage in any actual acts of violence or property destruction.   Simply put, the Defendant is being sentenced for entering the Capitol for 15-minutes with a crowd that exceeded an estimated 800 people.   Mr. HODGKINS did not hesitate to cooperate with law enforcement, to be one of the first individuals to accept responsibility and stand before a court for sentencing, and makes zero excuses for his bad judgment.

(v) the degree to which the defendant stood to benefit from the criminal activity; This is an important consideration.  The Defendant received absolutely nothing for what he views as a regrettable decision.  He did not receive a single dime, nor was he set to receive a single dime. He did not seek notoriety or fame.  However, the prize that Mr. HODGKINS received for being in the Capitol is unwanted notoriety[10], and the scarlet letter that many of his fellow citizens will

---

[10] The amount of scorn and derision that has come Mr. Hodgkin's way by individuals (and some in the media who appear to have their own agenda) who know nothing about him, or the facts of his case is both disheartening and

compel him to wear, without an ounce of knowledge or understanding of the man he is now.[11]

The pull between grace and vengeance is seen throughout our history.[12]  This push and pull has

manifested itself into the present cancel culture that permeates our society.   A significant

percentage of our population will "cancel" Mr. HODGKINS because of 15-minutes of bad

judgment, casting stones in his directions, all the while never fully realizing their own

indiscretions and hypocrisy.  Mr. HODGKINS will have to wear this scarlet letter long after the

sentence of this Court is fully served.   Whatever punishment this Court may provide will pale in

comparison to the scarlet letter Mr. HODGKINS will wear for the rest of his life.

   The Court should also consider that the Mr. HODGKINS has been wearing an ankle

monitor and for several months, was essentially on house arrest, after his February arrest.  When

you consider the litigation costs to Mr. HODGKINS, a man of extremely limited financial

means, along with the infamy that he will have to endure that goes with his picture on the Senate

floor plastered all over the internet, as compared to what this Defendant might have gained (e.g.,

absolutely nothing), it borders on overt unfairness not to see this Defendant as just a minimal

participant.   Justice compels this variance pursuant to §3553(a)(1).

---

shocking.   It is a sad commentary of where we are as a nation, and proves beyond any reasonable doubt the assertions being made in this sentencing memorandum.

[11] *The Scarlet Letter: A Romance* is a work of historical fiction by American author Nathaniel Hawthorne, published in 1850.   The Scarlet Letter explores guilt, revenge, and redemption in colonial America.  Set in Puritan Massachusetts Bay Colony during the years 1642 to 1649, the novel tells the story of Hester Prynne, who conceives a daughter through an affair and then struggles to create a new life of repentance and dignity. Containing a number of religious and historic allusions, the book explores themes of legalism, sin, and guilt.

[12] In Colonial America, common forms of public humiliation were the stocks and pillory, imported from Europe. Nearly every sizable town had such instruments of public humiliation, usually at the town square.   That is still borne out in present time.   The term "perp walk" is a good example: Presenting arrestees or prisoners to the public in restraints (such as handcuffs, shackles or similar devices) also serves as a convenient method of public humiliation besides the primary security aspects. The effect is complemented by presenting the person in a prison uniform or similar clothing.   Every newspaper in the country publishes a citizen's mug shot, which are then placed on the internet for all eternity for the world to see.    In the internet age, grace is a foreign concept.

A minimal participant decrease would apply to a defendant, like Mr. HODGKINS, who plays a minimal role in the criminal activity.[13]  It is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group.    The Defense contends, and the United States might concede, that as to this specific enterprise, Mr. HODGKINS was, at the very least, one of the least culpable of the group of people found within Capitol complex that have been charged with a felony.

The Court is required to review the totality of circumstances in deciding on a minor/minimal role variance.  A *minor* participant is a defendant who is "less culpable than most other participants, but whose role could not be considered as minimal." USSG § 3B1.2 (b), comment (n.4).[14]   In applying the 5 factors to the instant matter, we assert that Mr. HODGKINS has met the burden of showing a minimal role variance.

We contend that when one's role is similar to the several hundred Defendant's found inside the same building as Mr. HODGKINS who are being offered misdemeanors, and whose conduct is the same as the totality of the misconduct that is alleged in the instant case, as noted in the PSR paragraphs 10-19, that Mr. HODGKINS' role was only minimal and deserving of a variance.  Because Mr. HODGKINS is accepting a felony, giving him the minimal role variance creates a just result for sentencing purposes.  Importantly, this argument is about sentencing. The Defendant has pled to a felony offense because of his presence on the Senate floor.   Those being offered misdemeanors offense for being inside the Capitol could also arguably have been

---

[13] (Totality of Circumstances must be considered) A minimal participant is a defendant who "plays a minimal role" and is intended to cover defendants who are "plainly among the least culpable of those involved in the conduct of a group." U.S.S.G. § 3B1.2 (b), comment, (n. 4). A minimal participant is eligible for a 4-level decrease.

[14] One who falls in between the two is entitled to a 3-level reduction.  U.S.S.G. 3B1.2 "In cases falling between (a) and (b), decrease by **3** levels."  Also see; U.S.S.G. § 2D1.1 (b) (18).   If the defendant meets the criteria set forth in subdivisions (1)– (5) of subsection (a) of § 5C1.2 (Limitation on Applicability of Statutory Minimum Sentences in Certain Cases), decrease by 2-4 levels

compelled to plead to the same felony count as Mr. HODGKINS, but for the distinction of their location within the building.  While for findings purposes, Mr. HODGKINS presence inside the Senate chambers vice the Rotunda is an important consideration, for purposes of sentencing there is zero space between Mr. HODGKINS conduct and that of the several hundred others who entered the United States Capitol who are being sentenced for a misdemeanor offense.   Mr. HODGKINS should be treated likewise.   One surmises that had Mr. HODGKINS simply stopped at the Senate door, he also would be facing a misdemeanor charge rather than this felony offense.

In short, it was a crime was for ANYONE to enter the United States Capitol, period, full stop, on January 6th, 2021.  Regardless of where any of the 800 plus people may have been within the United States Capitol, whether the Senate chambers or the Rotunda, each should be treated equally for sentencing purposes so long as that person did not engage in any violence, possess a weapon, or engage in property damage.   Considering the facts of this case, it would be unjust to do otherwise.   A sentence to any confinement under the circumstance of Mr. HODGKINS case is a sentence far greater than is necessary to punish the misconduct that is being asserted by the United States and admitted to by Mr. HODGKINS in his plea of guilty.

**B.  Mr. HODGKINS has cooperated and will law enforcement at all times**

While the Defendant is not arguing that his actions would make him eligible to earn a 5K1.1 motion, it is important for the Court's consideration that Mr. HODGKINS cooperated with law enforcement.   When asked to hand over any electronic devices in his possession by the Department of Justice, and before any formal offer for a plea was made, the Defendant provided to law enforcement access to all of his electronic devices for their review.

16

**C.  The Need for the Sentence Imposed to Promote Certain Statutory Objectives:**

**(1)  To reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense**

The need for punishment is measured by the degree of "blameworthiness," which "is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime, and in particular, his degree of intent (mens rea), motives, role in the offense, and mental illness or other diminished capacity." Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?* 89 Minn. L. Rev. 571, 590 (February 2005).   The Guidelines include none of the factors bearing on Mr. HODGKINS degree of culpability.

*(a)  Mr. HODGKINS offenses were not motivated by financial gain.*

A Defendant's motive is highly relevant at sentencing.  *See* <u>Wisconsin v. Mitchell</u>, 508 U.S. 476, 485 (1993); <u>United States v. Mahan</u>, 2007 WL 1430288, at 3 (10th Cir. 2007) (sentence was procedurally unreasonable where district court refused to consider defendant's stated motive for possessing unloaded shotgun,  i.e., that he had been violently beaten by three men and sought to defend his wife); <u>United States v. Milne</u>, 384 F. Supp. 2d 1309, 1310-1311 (E.D. Wis. 2005) (granting variance where "defendant did not take bank's money out of greed or desire to live a lavish lifestyle, [but in an effort] to keep a sinking business afloat"); <u>United States v. Ranum</u>, 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005) (Defendant did "not act for personal gain or for improper personal gain of  another").

There is no evidence that the Defendant obtained or sought any wealth or fame for his offense.   While not presenting any excuse for the Defendant's conduct, money and/or fame was not a factor.   To the contrary, for a man who is both deeply private and humble, the Defendant wishes that his 15-minutes in the Capitol was 15-minutes of fame not received.

*(b) The seriousness of the offense has been mitigated by Mr. HODGKINS cooperation to the extent that he has accepted full and complete responsibility for the offenses by pleading as charged without the need for further litigation.*

Mr. HODGKINS, in addition to the above, has done everything in his power to cooperate.   He recognizes and acknowledges his culpability.   He did not require the United States to spend tremendous resources in the form of time and money, bringing witnesses half way around the nation, to prove its allegations.   He accepted full responsibility, and has thrown himself to the Court's mercy, seeking its grace, of which he merits.   Based upon the foregoing, Mr. HODGKINS should be given a downward variance beyond the simple 3 levels for acceptance of responsibility that are routinely given to those who negotiate a plea arrangement.

**(2) To afford adequate deterrence to criminal conduct**

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28 (2006)" Three National Academy of Science panels… reached that conclusion, as has every major survey of evidence." *Id.*; See *also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and Sentence Severity: An Analysis of Recent Research (1999),* summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European Countries. *Id.* at 1.  It examined the effects of changes to both the certainty and severity of punishment.  *Id.*  While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates…were not sufficient to achieve statistical significance."  *Id.* at 2.  The report concluded that

the "studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id.* at 1.

Given Mr. HODGKINS age (38), and other statuses consistent with what is mentioned above, the likelihood of Mr. HODGKINS ever re-offending is as close to zero as one might come. A severe punishment in this case is going to have the exact opposite effect than what is in the interest of United States, the Citizens of Florida, the Tampa Bay community, and justice. Should the taxpayer have to house and take care of Mr. HODGKINS when he represents absolutely no threat to ever re-offend in a way that would implicate the United States or the State of Florida, with the costs and expenses involved in warehousing him. We would take a productive taxpaying member of the Tampa Bay community, and turn him into a ward of the State. Mr. HODGKINS would go from being fully and gainfully employed as a working-class Tampa resident, to unemployed and homeless. The alternatives to incarceration make financial sense, conserve bed space for individuals from which society would need greater protection and would serve the ends of justice. Further still, the United States desires restitution in the case in the amount of $2000. It is, therefore, in the interest of the United States to keep Mr. HODGKINS gainfully employed so that he might be able to pay that restitution timely. §3553(a)(7).

We would ask the Court to also consider that Mr. HODGKINS is not just a productive member of the Tampa Bay community, but a man who gives of himself in a way that is admirable and noteworthy. Contained as an exhibit to this sentencing memorandum is documentation from *Feeding Tampa Bay, Metropolitan Ministries of Tampa Bay*, and the *Humane Society*, where Mr. HODGKINS has contributed over 100 hours of unpaid community service since January 1st. These are activities that Mr. HODGKINS has normally engaged in

prior to his arrest.  When you consider that Mr. HODGKINS is not wealthy in any way, shape or form, and rents a home in what is considered the poorest, working class neighborhood in Tampa, and takes his time off on weekends to serve the homeless, is truly noteworthy, and dare I say, incredible.   Mr. HODGKINS works over 40 hours a week, lives pay check to pay check, barely getting by financially, and chooses to serve those EVEN poorer than he.   Mr. HODGKINS is a unique Defendant, the likes of which I have not experienced.   He is such an honorable, hardworking, gracious and thoughtful citizen, and there is so much to admire in him.    If there was ever a person before this Court that merit leniency, Mr. HODGKINS possesses every attribute of that very person.

### (3) to protect the public from further crimes of the defendant

The Defendant has literally no criminal history in accordance with the PSR.  For example, those in a Criminal History Category I, the recidivism rate is 15.2%.  For those who have been employed, the rate is 12.7%; and for those who were ever married, the rate is 9.8%. For those with no history of illicit drug use, the recidivism rate is half those who have a drug history.  *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* at Exh. 9, at 28; Exh. 10, at 29 (May 2004) [hereinafter *Measuring Recidivism*].   Please consider that the Defendant possesses every single one of these characteristics and represents an individual with an extremely low recidivism rate.

The Commission has recognized the advisability of revising the guidelines to take age of the offender into account. *See Measuring Recidivism* at 16 (noting that "[o]ffender age is a pertinent characteristic" that would "improve [the] predictive power of the guidelines "if incorporated into the criminal history guidelines, but has recently stated that age "may be relevant" in granting a variance. (USSG 5H1.1).

In imposing the least sufficient sentence to account for the need to protect the public from further crimes of this Defendant, this Court should consider the statistically low risk of recidivism presented by Mr. HODGKINS history and characteristics, and his strong work history of having full time employment with the same employer for the past 7 years.   *See e.g., United States v. Urbina,* slip op., 2009 WL 565485, *3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by Defendant's lack of criminal history, positive work history, and strong family ties); *United States v. Hamilton,* 323 Fed. Appx. 27, 31 (2d Cir. 2009)("the district court abused its discretion in not taking into account policy considerations with regard to age and recidivism not included in the Guidelines"); *United States v. Holt, 486 F.3d 997, 1004 (7th Cir. 2007)(*affirming below guidelines sentence based on defendant's age, which made it unlikely that he would be again involved in a violent crime); *United States v. Cabrera,* 567 F. Supp. 271, 279 (D. Mass. 2008)(granting variance because defendant's "with zero criminal history points are less likely to recidivate than all other offenders"); *Simon v. United States,* 361 F. Supp. 2d 35, 48 (E.D.N.Y. 2005)(basing variance in part on Defendant's age of 50 upon release because recidivism drops substantially with age); *United States v. Nellum,* 2005 WL 300073 at *3 (N.D. Ind. Feb. 3, 2005(granting variance to 57 year-old defendant because recidivism drops with age); *United States v. Ward,* 814 F. Supp. 23, 24 (E.D. Va. 1993)(granting departure based on defendant's age as first time offender since guidelines do not "account for the length of time a particular defendant refrains from criminal conduct "before committing his first offense).   On these matters alone, the Defendant qualifies for a downward variance pursuant to §3553(a).

**(4).  The Need to Avoid Unwarranted Disparities**

The Court must consider the need to avoid unwarranted disparities among defendants with similar criminal histories convicted of similar criminal conduct.  18 U.S.C 3553(a)(6).  The

Court should avoid unwarranted similarities in sentencing among defendants who are different in ways not accounted for in the guideline range, *See* <u>Gall v. United States</u>, 552 U.S. 38, 55 (2007)("need to avoid unwanted *similarities* among other co-conspirators who were not similarly situated"); <u>United States v. Ovid</u>, 2010 WL 3940724 (E.D.N.Y 2010)(sentencing two defendants with similar guideline ranges to 60 months and 126 months respectively based on distinctions in circumstances of the offenses and characteristics of the defendants), and unwarranted differences among defendants whose conduct and characteristics are similar. *See* <u>United States v. Parris</u>, 573 F. Supp. 2d 744, 753, 756-62 (E.D.N.Y. 2008).

As of this writing, only one other person has been sentenced for the activities that occurred on January 6th, 2021.   Anna Morgan-Lloyd was sentenced to three years of probation and ordered to pay $500 in restitution after pleading guilty to one charge of misdemeanor disorderly conduct.   Like the Defendant, Morgan-Lloyd said she went to Washington on Jan. 6 to support then-President Donald Trump at the "Save America" rally, and later posted about her participation in the riots on social media.   Ms. Morgan-Lloyd was also found to be inside the Capitol, and like Mr. HODGKINS, was not accused of any property damage, or engaging in violent activities with law enforcement.   Like Mr. HODGKINS, she simply followed the crowd. The distinction was simply their location within the Capitol itself.

The Defendant is before the Court facing punishment for the allegation brought against him because the Defendant chose to accept full responsibility.   Based on the facts of this case, it would be a terrible injustice if the Defendant is sentenced in a manner differently than the sentence for Ms. Morgan-Lloyd.   For sentencing purposes, their misconduct is identical.   Their actions are essentially identical, except for their location within the Capitol, which has resulted in my client accepting a felony charge vice a misdemeanor.   Simply put, had Mr. HODGKINS

stopped at the threshold of the Senate's door, he would have likely also been offered a misdemeanor.   The imposition of a felony for spending five minutes on the floor of the Senate is a severe and continuing punishment in its own right.   For sentencing purposes, however, and given Mr. HODGKINS characteristics and conduct on that day, a sentence of similar proportions to those inside the Capitol who are being offered a misdemeanor is just and appropriate.

### D.  **Mr. HODGKINS history and characteristics warrant a downward variance.**

This  Court  should  vary  in  accordance  with  §3553(a)  to  further  reflect  Mr. HODGKINS history, and characteristics.  Mr. HODGKINS is not diminishing the seriousness of the events that transpired on January 6th, 2021, but his 15-minutes inside the Capitol are mitigated  in  this  case  by  Mr. HODGKINS  overall  minimal  participation,  the  circumstances surrounding the unrest that occurred that day, and his lack of motivation for committing the offense to which he has now entered a plea.   As for  punishment,  Congress  requires  this  Court to  consider  a  "just  punishment."  Mr. HODGKINS, as stated and acknowledged above, made a poor choice, one clouded by being swept up in the moment and in following the crowd, unique to this situation and fact pattern that will never re-occur.   Mr. HODGKINS has no criminal history and simply would not premeditatively violate the law.   This incident is simply out of character for him.

To be clear, Mr. HODGKINS did not think his conduct through to its logical conclusion. Put more simply, who takes a selfie of themselves if they believe they are actually committing a crime.   Mr. HODGKINS clearly displayed bad judgment, and began to realize early on after he left the Capitol the seriousness of his display of poor judgement.  But Mr. HODGKINS has paid a very very heavy price for having poor judgment.   He is now a convicted felon for what was a 15-minute sojourn in the wrong location.   How much punishment becomes too much?   One hopes

that justice is not defined by incarcerating a man with no prior record, with no allegation of property damage or violence, for a 15-minute trespass committed by 800 other people at the same moment in time, simply because of his location in the building.  The Defense would assert that Mr. HODGKINS has paid his debt to society already by his plea to a felony charge and his previous five months of supervised release, and that further severe punishments, such as incarceration, serve no further purpose.

Society recognition of every sentencing principle have all been served in this matter. Both specific and general deterrence have already been met by Mr. HODGKINS arrest, his restriction to his residence for several months, the curfew placed upon him, the limitation upon his movements, and the permanent depravation of several constitutional and civil rights for all time. Mr. HODGKINS past history of being a law-abiding citizen, the fact that he is a productive member of Tampa society, and his cooperation both past and present with law enforcement all testify to his rehabilitative potential.   This Court should vary downward by a substantial margin to ensure that Mr. HODGKINS is not unduly punished for this offense.

What is being requested is that the Court considers a sentence that both reflects the seriousness of the offense committed, and promotes respect for the law, but provides a just punishment to someone whose role was quite remote.  Indeed, a harsh sentence does nothing to deter one who is already deterred and frankly fully rehabilitated.   Such a punishment punishes the United States and Florida taxpayers more than it dispenses justice to the Defendant.   While the Defendant needs to be punished, such punishment should not be more than necessary to get the point across to the Defendant that his actions were not acceptable and cannot occur again in the future.

In short, a sentence that allows Mr. HODGKINS to continue to work full time, and

be a fully productive member of the Tampa community is a sentence that serves both the United States, its Citizens, and the overall tenants of justice.

**E.   Although not Applicable in this Case, the Defendant would be Safety Valve Eligible**

The Safety Valve is not applicable in this case.  However, pursuant to § 3553(a), it is helpful to consider how, if the provisions were to apply, Mr. HODGKINS conduct concerning this matter would have made him otherwise eligible if applicable.  In that respect, it is offered here as helpful guidance for the Court in considering a variance from the recommended sentencing guidelines.

The First Step Act was made law on December 21, 2018.  The First Step Act amended parts of 18 U.S.C. 3553 which has the effect of broadening the Safety Valve so it is allowing the Court to depart from the applicable minimum mandatory sentence.   The "safety valve" provision at 18 U.S.C. § 3553(f) directs courts to impose sentences "without regard to any statutory minimum sentence" if the five conditions listed at § 3553(f)(1)-(5) are met.  This means that if the five statutory conditions are met, there is no mandatory minimum term. The five statutory conditions are listed nearly verbatim at §5C1.2(a)(1)-(5). The defendant bears the burden of proving by a preponderance of evidence that all five conditions are met. See, e.g., *United States v. Zakharov*, 468 F.3d 1171, 1181 (9th Cir. 2006) ("[t]he defendant holds the burden of demonstrating by a preponderance of the evidence that he qualifies for . . . safety valve treatment"); *United States v. Johnson*, 375 F.3d 1300, 1302 (11th Cir. 2004) ("[t]he burdens is on the defendant to show that he has met all of the safety valve factors"). Once the court finds that the conditions are met, the court has no discretion but to apply the guidelines without regard to the mandatory minimum. See, e.g., *United States v. Myers*, 106 F.3d 936, 941 (10th Cir. 1997); *United States v. Real-Hernandez*, 90 F.3d 356, 361-62 (9th Cir. 1996).

The Defense would assert that because the Defendant meets the requirements for the "safety valve" reduction as set forth at §5C1.2(a)(1)-(5) (See, e.g., _United States v. Torres-Landrua_, 783 F.3d 58, 62 (1st Cir. 2015)), that the court would be permitted to provide a variance in the Defendant's sentence in addition to any variance for a minimal participant role. In doing so, we would ask this Court to sentence Mr. HODGKINS within ZONE A of the sentencing table.  It should be noted specifically that the PSR and the facts of this case provide evidence beyond a preponderance that the Defendant has satisfied all five elements required to qualify for safety valve treatment.

_1. No more than one criminal history point:_

This criterion is met only if the defendant, by a straight application of §4A1.1, has no more than one criminal history point.  In the instant case, the Defendant meets these criteria.

_2. No violence or weapon:_

This criterion is met if the defendant did not possess a firearm in connection with the offense.   In the instant case, no weapons were found on the Defendant.

_3.  No death or serious bodily injury:_

There were no injuries associated with any actions of this Defendant or with any party affiliated with the Defendant or his activities from the time he entered the Capitol until the time he left (approximately 15 minutes).

_4.  No leadership role adjustment:_

It is important to note here that the Defendant's role in this was minimal in terms of everyone else's overall involvement.  Nor was the Defendant part of a continuing criminal enterprise.

_5.  Full and truthful disclosure:_

The final criterion is that the defendant makes a full, truthful disclosure to the government no later than sentencing.  The Defendant has, to the best of his abilities, provided a complete disclosure to the government, to include entering a plea of guilty as charged, and his full admission to the facts of this case as provided by the United States.   In addition, he cooperated with law enforcement and the Department of Justice at all time throughout this matter.

In this respect, the Court should provide a variance in addition to any minimal role variance.  We would request that this court sentence Mr. HODGKINS within ZONE A of the sentencing table.

### F. <u>Additional Matters for the Court's Consideration for Variance Pursuant to §3553(a)</u>

Mr. HODGKINS employer has kept the faith with him.   During this time, they have kept Paul gainfully employed.   Paul has worked full time for the past 7 years.   His employer has gone as far as to put Paul into an apprenticeship program that will allow him to gain promotion and a pay increase (see attached Exhibit).   Any sentence of confinement will result in Paul losing his position with his Employer and the opportunity that goes with this apprenticeship.   Any confinement would have both a devastating financial and personal impact.   To begin, Mr. HODGKINS would become unemployed.   Second, he rents a very small home in Sulphur Springs (a lower income working class neighborhood in Tampa) that he would lose.  In short, he would become homeless.  However, should this Court give Mr. HODGKINS a variance, that allows him to be sentenced within ZONE A or B of the sentencing table, the Court could give Mr. HODGKINS home detention, that would allow him to continue his employment.   Such a sentence would serve the interest of justice, while allowing Mr. HODGKINS to continue to be a productive member of the Tampa community.

While the Court will sentence Mr. HODGKINS in Washington, Mr. HODGKINS will live and work in Tampa.   A sentence that allows Mr. HODGKINS to continue to be a productive member of the Tampa community is one that serves the interest of the citizens of the State of Florida.   A sentence that disables Mr. HODGKINS ultimately punishes the Tampa community from where Mr. HODGKINS lives and works.

Mr. HODGKINS will be ordered to pay $2000 in restitution.   The need for paying restitution certainly outweighs the need for confinement.   §3553(a)(7).   By providing a sentence that keeps Mr. HODGKINS gainfully employed, he will be able to pay restitution more readily and continue to be a productive taxpaying member of the Tampa Bay community.

Mr. HODGKINS is a well thought of member of the Tampa Community.   Attached as an exhibit are nine (9) affidavit's all attesting to Mr. HODGKINS reputation in the Tampa community for law-abidingness and other admirable attributes.    As stated above, Mr. HODGKINS also uses his spare time to help others less fortunate than himself.   I think it may be safe to assert that rarely has this Court sentenced someone whose attributes are more admirable.

When you sentence PAUL HODGKINS, I would ask you to consider these two images:

 

Both images are selfies.   Both taken by Paul.   The first, taken on January 6th, 2021, on the floor of the United States Senate.   The second image on right was taken by Paul after leaving Easter church services at Idlewild at the Springs, Baptist Church, located a few blocks from where Paul resides.   The saying goes that a picture speaks a thousand words.   There is some truth in that.  When I look at the image on the left, I see a man who looks lost, and who lost his way.   When I look at the image on the right, I see a man born again.   A man who found a church home for the first time in his life, and the look of a man who has found the freedom that one receives  when one experiences heavenly grace.  The man to be sentenced by this Honorable Court is not the man who was lost on the left, but the man who has been found on the right.

While seemingly ironic, from an eternal view of this earthly life, the events of January 6th, 2021, for PAUL HODGKINS, have worked together for Paul's good.[15]

Mr. HODGKINS has prepared a statement for the Court.   It was done completely by him, and without my input.   I would ask this Court to listen carefully to what Paul will say.   It is

---

[15] *See* Romans 8:28.

a wonderful message, and far more powerful than anything written here.   I have tried to paint an accurate and honest picture of Mr. HODGKINS.  However, what the Court will hear from him is far more powerful than anything more I could write here.  It is an honorable statement made by an honorable man, who takes responsibility, makes no excuses, who has experienced Godly grace, and will request from this Court earthly grace.

## **CONCLUSION**

This Court finds itself in a unique and awesome position.   Mr. HODGKINS represents the first felony case, with several hundred more behind him.  The sentence of this Court for this humble and honorable man will speak to what we have become as a nation.   On April 3, 1865, President Lincoln met with Ulysses S. Grant just outside of Richmond, at the house of former U.S. Representative Thomas Wallace.  General Robert E. Lee had just evacuated Richmond, moving west toward Appomattox Courthouse.   General Grant briefed President Lincoln on his plan to defeat the Army of Northern Virginia and to end the war.  Lincoln spent about thirty minutes talking about his thoughts on reconstruction and his desire for a lenient policy toward the south. Their meeting lasted about ninety minutes.  The next twelve days were among the most significant in the history of the United States. Grant departed Petersburg and headed west to catch up with and defeat Lee's army. Six days after the meeting with the president at the Wallace House, Grant received Lee's surrender at Appomattox Court House, which effectively ended the Civil War.  The heart of the terms was that the Confederates would be paroled after surrendering their weapons and other military property. If surrendered soldiers did not take up arms again, the United States government would not prosecute them. Grant also allowed Confederate officers to keep their mounts and side arms. Some accounts mention that Grant glanced at Lee's dress

sword before including that line, and Grant indicated he included it to avoid any unnecessary humiliation for the Confederate officers.

This Court stands in the shadows of Lincoln and Grant.   The rebellion of the south did not deserve the "grace" that Lincoln and Grant had desired to provide.   But the malice and humiliation that many might have sought would not heal the nation as both Lincoln and Grant fully understood.   Vengeance and retribution never achieve their intended effect.  For those seeking forgiveness, grace is always in order.  Our forefathers bear a message that this Court would be wise to adhere.   We live, as then, in a nation divided by political divisions.  Many on one side of the spectrum seek vengeance and the malice with which that would bring, and a deepening division of the nation as a result.  However, a sentence that provides PAUL HODGKINS "charity" would go a very long way toward healing a nation in dire need of seeing what undeserved "grace" looks like.  PAUL HODGKINS should not be cancelled.  A merciful and charitable sentence would be one that Lincoln and Grant would approve.

**WHEREFORE** the Defendant, PAUL HODGKINS, prays this Court will grant the relief sought herein, and grant a variance downward pursuant to §3553(a) to the lowest end of the applicable Guidelines Range, and as required by applicable law, and sentence Mr. HODGKINS within ZONE A, to such a sentence that avoids any and all confinement, and one that would allow Mr. HODGKINS to continue to be a productive member Tampa.

DATED this 12th day of July, 2021.

Respectfully submitted,

*Patrick N. Leduc*

Patrick N. Leduc  0964182
4809 E. Busch Blvd., Ste. 204
Tampa, FL 33617
813-985-4068
813-333-0424
Florida Bar #0964182
Attorney for Defendant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that a true and correct copy of the foregoing Motion to Continue was filed with the Clerk of the Court and was sent via electronic mail to the United States Attorney Office at 1400 New York Avenue, Room 7113, Washington D.C. 20530, and ECM to the Assistant United States Attorney, Mr. Mona Sedky, on this 12th day of July 2021.


*Patrick N. Leduc*
Patrick N. Leduc  0964182
4809 E. Busch Blvd., Ste. 204
Tampa, FL 33617
813-985-4068
813-333-0424
Florida Bar #0964182
Attorney for Defendant