**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-188-RDM** |
| **PAUL A. HODGKINS,** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the Acting United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.

**I.      Introduction**

The defendant, Paul Hodgkins, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than a million dollars' worth of property damage.   Hodgkins entered the Capitol wearing a backpack containing protective eye goggles, rope, and white latex gloves, among other items.   He made his way to the heart of the proceeding that he has pleaded guilty to obstructing – the Senate chamber – where he took "selfie-style" photographs and saluted others who were shouting and cheering from a nearby raised platform in the well of the chamber.   The government nonetheless recognizes that Hodgkins did not personally engage in or espouse violence or property destruction, he accepted responsibility early and in a fulsome manner, and he has taken significant steps toward his rehabilitation.   Accordingly, the government recommends that the Court sentence Hodgkins to 18 months in custody, which is the mid-point of the Sentencing Guidelines as calculated by the U.S.

Probation Office and as contemplated in the parties' plea agreement.  An 18-month, within Guidelines sentence is also supported by the U.S. Probation Office's conclusion that neither a downward departure nor a downward variance is warranted in this case.  *See* Presentence Investigation Report ("PSR") at ¶¶ 108-109.

II.     **Factual and Procedural Background**

*The January 6, 2021, Attack on the Capitol*

On January 6, 2021, several hundred rioters, Hodgkins among them, unlawfully broke into the U.S. Capitol in an effort to disrupt the peaceful transfer of power after the November 3, 2020 Presidential election.  Many rioters attacked and injured law enforcement officers, sometimes with dangerous weapons; they terrified others on scene that day, many of whom fled for their safety; and they ransacked the place—vandalizing, damaging, and/or stealing artwork, furniture, and other property.  Although the facts and the circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day.

The day started out calmly enough.   As set forth in the PSR and the Statement of Offense incorporated into Hodgkins' plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol.  Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020 Presidential election.  By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.   Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, and with Vice President Pence present and presiding over

2

the Senate, a large crowd gathered outside the U.S. Capitol.   Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside.   At approximately 2:00 p.m., certain individuals unlawfully forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building.   Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.   Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd unlawfully forced entry, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers.   All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured.   Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.   *See* Statement of Offense; PSR at ¶¶ 10-19.

*Hodgkins' Role in the January 6, 2021, Attack on the Capitol*

For his part, Hodgkins traveled to Washington, D.C., by bus from Tampa, Florida.   On January 6, at approximately 2:50 p.m., he entered the U.S. Capitol.   He carried a red flag with "Trump 2020" written in white letters.   Hodgkins also carried a backpack that had, among other items, protective eye goggles, rope, and white latex gloves.   At approximately 3:00 p.m. Hodgkins

3

entered the Senate chamber.   As he walked among the Senators' desks, Hodgkins removed the goggles he had donned, took "selfie-style" photographs with his cell phone, and put on and then removed his white latex gloves.   Hodgkins walked down to the Senate well, where he stood adjacent to an elevated desk and platform.   A few feet away, standing on the platform, several other rioters were shouting, praying, and commanding the attention of others in the Senate chamber.   One of those individuals was shirtless, wearing face paint, and using a bullhorn to speak.   Hodgkins remained standing with them while they continued to shout, cheer, and say prayers using the bullhorn.   Finally, Hodgkins raised his flag in salute.   At approximately 3:15 p.m. Hodgkins exited the Senate chamber and the U.S. Capitol.

Hodgkins has admitted that he knew that he did not have permission to enter the Capitol building and that he acted with the intent to corruptly obstruct, influence, and impede an official proceeding, that is, Congress's certification of the Electoral College vote.   *See* Statement of Offense; PSR at ¶¶ 10-19.

### *Injuries and Property Damage Caused by the January 6, 2021, Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy."   *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).   Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself."   *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021); *see also United States v. Fox*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish.   This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system."); *United*

*States v. Chrestman*, No. 21-mj-218, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.").

In addition, Hodgkins' fellow rioters injured more than a hundred members of law enforcement.  *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and Committee on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries).   Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during the hours-long hand-to-hand combat with law enforcement officers.  *See id.* at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety.  *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building.  They caused extensive, and in some instances, incalculable, losses.  This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and

Capitol Building hallways.   *See id*; *see also* United States House of Representatives Curator Farar

Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb.

24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-

AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues).   As set

forth in the Statement of Offense, the attack resulted in substantial damage to the U.S. Capitol,

requiring the expenditure of more than $1.4 million for repairs.

<em>The Charges and Plea Agreement</em>

On February 9, 2021, Hodgkins was charged by complaint with violating 18 U.S.C. §§

1512(c), 2, 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G).   On February 16, he was

arrested at his home in Tampa, Florida.[1]   On March 5, 2021, a federal grand jury indicted

Hodgkins and charged him with the same crimes.   Almost as soon as he was represented by

counsel, Hodgkins, through his attorney, expressed his interest in pleading guilty and in being one

of the first defendants to do so.   Early on, he indicated his willingness to plead to the felony 18

U.S.C. § 1512 charge.

### III.    Statutory Penalties

The defendant now faces sentencing on a single count of 18 U.S.C. § 1512(c).   As noted

by the plea agreement and the U.S. Probation Office, the defendant faces up to 20 years of

imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years.

---

[1]      Hodgkins did not, as he seems to assert in his sentencing memorandum, voluntarily
disclose his involvement to law enforcement, and, when officers arrested him, they also had a
search warrant for his home and electronic devices.   *See* Def. Amended Sentencing Memo at p.
8.

## IV.     The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Hodgkins' adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2J1.2) | 14 |
| Substantial interference w/ administration of justice (U.S.S.G. § 2J1.2(b)(2)) | 3 |
| Acceptance of responsibility (U.S.S.G. § 3E1.1) | <u>-3</u> |
| Total adjusted offense level: | 14 |

*See* PSR at ¶¶ 24-33.

The parties agree, and the U.S. Probation Office recommends, that a three-level upward adjustment applies under U.S.S.G. § 2J1.2(b)(2) because "the offense resulted in substantial interference with the administration of justice." The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. Hodgkins admitted that he corruptly obstructed and impeded an official proceeding, namely the certification of the Electoral College vote count. He did so by unlawfully

7

entering the U.S. Capitol alongside hundreds of other rioters with whom he shared in a unified goal: to block Congress from completing the certification. Defendant's obstructive conduct took place amidst a violent riot that engulfed the entire Capitol. The riot resulted in evacuations, vote count delays, officer injuries, and over $1.4 million in property destruction. Law enforcement from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters. Ultimately, the rioters' conduct literally stopped the official proceeding in its tracks. This constituted an even greater interference and intrusion than the examples of serious disruptions listed in the commentary regarding the application of this enhancement. *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1 ("a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources"). One need only imagine a judicial proceeding underway in a courthouse surrounded and breached by rioters, intent on halting a trial, to appreciate that the interference on January 6 was substantial by any measure.[2]

The U.S. Probation Office calculated Hodgkins' criminal history as a category I, which is not disputed. PSR at ¶ 36. Accordingly, the U.S. Probation Office calculated Hodgkins' total adjusted offense level, after acceptance, at 14, and his corresponding Guidelines imprisonment range at 15-21 months. PSR at ¶¶ 33, 83. Hodgkins' plea agreement contains an agreed-upon Guidelines calculation that mirrors the U.S. Probation Office's calculation.

---

[2]     While the government reserved the right to seek an upward departure pursuant to U.S.S.G. § 3A1.4, n.4 (*see* Plea Agreement at 4), based on the facts and circumstances of this case, we are not seeking such a departure.

## V.     Sentencing Factors Under 18 U.S.C. § 3553(a)

The Court should next consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). *Gall*, 552 U.S. at 49-50.   Under § 3553(a), "[t]he Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.   18 U.S.C. § 3553(a).   The purposes of sentencing, pursuant to § 3553(a)(2), are as follows:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

The Section 3553(a) factors include the following:   (1) "the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1); (2) "the history and characteristics of the defendant," *id.*; (3) the promotion of "respect for the law," 18 U.S.C. § 3553(a)(2)(A); (4) "deterrence," 18 U.S.C. § 3553 (a) (2)(B); (5) the Guidelines and Guideline range, 18 U.S.C. § 3553(a)(4); and (6) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   18 U.S.C. § 3553(a)(6).

Of course, a "sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply," *Rita v. United States*, 551 U.S. 338, 351 (2007), and it "may not presume that the Guidelines range is reasonable," *Gall*, 552 U.S. at 39; *Nelson v. United States*, 555 U.S. 350, 352 (2009).   Examination of the Section 3553(a) factors, however, shows that a Guidelines sentence is appropriate in this case.   Moreover, a sentence at the mid-point of the Guidelines range is warranted.

## A.     Nature and Circumstances of the Offense

9

On January 6, 2021, Hodgkins purposefully joined a large group of rioters intent on interfering with the nation's electoral process.   In doing so, Hodgkins and others not only imperiled core democratic functions but also collectively caused enormous emotional, physical, and financial injuries along the way.

As set forth in Hodgkins' Statement of Offense, Hodgkins and the other rioters successfully shut down the certification of the electoral vote count for several hours, as members of Congress and their staff were forced to take shelter from the violence.   As noted above, the rioters injured over a hundred law enforcement officers and terrified individuals on scene that day, leaving significant emotional scars.   They destroyed over $1.4 million in property.   This number understates the extent of the property damage, as it does not include the irreparable and unquantifiable damage to artwork, statues, and other artifacts that were stolen or damaged.

As for Hodgkins' role in the attack, as noted above, he acted with premeditation and was prepared for violence from the outset.   He then made a series of choices along the way, culminating in his personal role in obstructing the vote count-related conduct in the Senate chamber and the felony criminal charge of which he was convicted.

Hodgkins' first key decision point was back in Tampa, before he boarded the bus to D.C. He decided to put in his backpack rope, protective eye goggles, and latex rubber gloves.   Even if intended as some type of "first aid" kit, Hodgkins' preparation further confirms that, from the beginning, he anticipated the possibility of being involved in a violent conflict in D.C.   Like the Eagle Scout he proudly claims to be, *see* Def. Amended Sentencing Mem. at p. 3, Hodgkins wanted to be prepared.

His second key decision point was at the "Stop the Steal" rally.   Hodgkins decided to leave

the rally and walk the 1.7 miles from the Ellipse toward the U.S. Capitol Building, with his backpack on his back, his eye goggles around his neck, and the Capitol in his sight.   He had almost two miles to change his mind and decide to turn back.   But instead he chose to press forward.

His third key decision point came at the cordoned-off grounds outside the U.S. Capitol Building.   Hodgkins decided to enter the grounds and walk toward the building.   At this point, around 2:45 p.m., Hodgkins' path was littered with downed barriers, tear gas, smoke, broken glass and property destruction, and physical violence.   He would have seen how outnumbered the law enforcement officers were.   Hodgkins had any number of opportunities to turn back.   But he pushed ahead instead.

Hodgkins' fourth key decision point came when he stood outside of the doors to the U.S. Capitol Building.   Hodgkins chose to enter the building.   By Hodgkins' own admission, as he walked inside, he saw broken windows and people who were injured.   Had there been any doubt in his mind before (and the government does not think that there was), it would have been abundantly clear to Hodgkins that this was no peaceful protest.   It was an attack.   Again, Hodgkins could have turned back and remained outside.   But once again, he instead pressed forward.

Hodgkins' fifth key and critical decision point came when he stood outside the doors to the Senate chamber.   He decided to put his eye goggles on and enter that room—the very room in which the Senators and Vice President Pence were meeting in connection with the vote count an hour earlier.   It was in the Senate chamber that Vice President Pence had been sitting at his desk at the Senate well.   Again, Hodgkins could have turned back but instead chose to push on.

Hodgkins' last key decision point came when he walked down to the Senate well and stood

11

a few feet away from the dais, where several other rioters were standing on an elevated platform, hovering over Vice President Pence's desk.   One, shirtless and wearing face paint, was using a bullhorn to rally the others in chants, rants, and prayers.   At this point, Hodgkins would likely have seen other rioters removing or taking photographs of documents off Senators' desks.   By his own admission, inside the Senate chamber, Hodgkins saw another rioter who had been injured by what he thought was a rubber bullet.   Hodgkins decided to walk toward the elevated platform, flag in hand, and make himself part of the action.

The government recognizes that Hodgkins did not personally destroy property or engage in any violence against law enforcement officers.   But he was surrounded by others who were doing both, and he entered the Capitol as others had paved the way with destruction and violence. Time and time again, rather than turn around and retreat, Hodgkins pressed forward until he walked all the way down to the well of the Senate chamber.

Hodgkins came to D.C. preparing to encounter violence around him.   He was a rioter, not a protester, and his conduct shows that he was determined to interfere with the vote count and the peaceful transition of power in the 2020 Presidential election.   Hodgkins entered the Senate chamber, where he joined the chanting and ranting at the dais.   This was precisely where, only 40 minutes earlier, the Vice President had been sitting at the desk on the elevated platform, surrounded by Senators who were considering a procedural issue related to the certification of the Electoral College vote.   In the end, Hodgkins, like each rioter, contributed to the collective threat to democracy, physical safety, emotional well-being, and property on January 6, 2021.

Accordingly, the nature and circumstances of the offense support the recommended 18-month, within Guidelines sentence.

**B.**        **The History and Characteristics of the Defendant**

As set forth in the PSR, Hodgkins has no criminal history and has had stable employment. Since the time of his arrest, Hodgkins has complied with his conditions of release and seems to have made meaningful efforts at rehabilitation.   The government notes that Hodgkins provided a full confession to law enforcement officers when they interviewed him both before and at the time of his arrest.   Through his attorney, from the very outset, Hodgkins expressed his desire to plead guilty and to be one of the first to do so.   From the beginning, he was willing to plead to felony charges.   He never wavered from that position and was the second defendant (out of hundreds charged) to plead guilty to felony charges.

This factor supports the government's recommended mid-range sentence of 18 months in custody.

**C.**    **Respect for the Law**

A sentence at the mid-point of the Guidelines range is also necessary to promote respect for the law.   Hodgkins' criminal conduct, the corrupt obstruction of an official proceeding, is the epitome of disrespect for the law.   "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[3]   When Hodgkins entered the Capitol grounds, the Capitol itself, and the Senate chamber, it was abundantly clear to him that lawmakers, and the law enforcement officers who tried to protect them, were under siege.   Law enforcement officers

---

[3]        Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

13

were overwhelmed, outnumbered, and in some cases, in serious danger.   The rule of law was not only disrespected, it was under attack that day.   A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings are not taken seriously.   In this way, a lesser sentence could encourage further abuses.   *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

## D.      Deterrence

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others.   18 U.S.C. § 3553(a)(2)(B).   The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.   *Cf.* U.S.S.G. § 3A1.4, n.4 (providing for an upward departure where the offense was "calculated to influence or affect the conduct of government by intimidation or coercion . . . .").[4]   Moreover, with respect to specific deterrence, courts have recognized that "terrorists[,] [even those] with no prior criminal behavior, are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." *United States v. Jayyousi*, 657 F.3d 1085, 1117 (11th Cir. 2011) (quoting *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003)); FBI Director Wray's Statement (noting that some actors have been emboldened in the aftermath of the breach of the U.S. Capitol).

## E.      The Importance of the Guidelines

---

[4]      *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").   While the government is not seeking an upward departure in this particular case pursuant to U.S.S.G. § 3A1.4, n.4 (*see* p. 8, n.2, *supra*), the defendant's conduct was "calculated to influence or affect the conduct of government by intimidation or coercion . . . ."   *Id.*

The advisory Guidelines range should be given considerable weight.   First, the Guidelines range is itself a § 3553(a) factor.   "The fact that § 3553(a)[(4)] explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process."   *Gall*, 552 U.S. at 50, n.6.   Indeed, "the sentencing court must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the [Guidelines range] with reference to the latter." *Nelson*, 555 U.S. at 350.

Second, one of the Sentencing Commission's purposes in promulgating the Guidelines was to "assure the meeting of the purposes of sentencing as set forth in section 3553(a)(2)."   28 U.S.C. §§ 991(b)(1)(A), 994(f).   The Commission wrote the Guidelines to "carry out these same § 3553(a) objectives," resulting in "a set of Guidelines that seek to embody the § 3553(a) considerations, both in principle and in practice." *Rita*, 551 U.S. 338, 350.

Third, Congress is the ultimate maker of sentencing policy, *Mistretta v. United States*, 488 U.S. 361, 363 (1989); *Dorszynski v. United States*, 418 U.S. 424 (1974); *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 94 (1820), and the Guidelines reflect the views of Congress through its instructions to the Commission, the Commission's effort to "establish a sentencing range that is consistent with all pertinent provisions of Title 18," Congress's review of all Guidelines before they take effect, and Congress's direct input into certain Guidelines.   *See, e.g.*, 28 U.S.C. §§ 991(b), 994(b)(1), (h)-(l), (p).   Members of the federal judiciary also had input into the Guidelines directly as Commission members and commentators and indirectly through the Commission's ongoing and "careful study based on extensive empirical evidence derived from the

review of thousands of individual sentencing decisions." *Gall*, 552 U.S. at 46; 28 U.S.C. § 994(o)-(p).

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita*, 551 U.S. at 349.   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"   *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108.   Accordingly, courts must give "respectful consideration to the Guidelines."   *Id.* at 101.   As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. § 1A1.1, intro, comment 3.   More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process.   See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines).   Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case.   Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005).   "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable

one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will – the same Congress that served as a backdrop to this criminal incursion – the Guidelines will be a powerful driver of consistency and fairness moving forward.

## F.    Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6) – the need to avoid unwarranted sentencing disparities – the crimes that Hodgkins and others like him committed on January 6 are unprecedented.   These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other §1512 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified. In any event, Hodgkins is one of the first to be sentenced, and thus, there is no apt comparison.

## VI.    § 3553 Analysis

Taking into account all of these factors, a Guidelines sentence is most appropriate in this case.   While the government credits the defendant's early acceptance of responsibility, it cannot ignore the gravity and weight of this crime. Thus, not only do the Guidelines provide critical

context at sentencing, but the remaining factors – the nature and circumstances, § 3553(a)(1); the need to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for adequate deterrence, § 3553(a)(2)(B); and the need to protect the public from further crimes of the defendant, § 3553(a)(2)(C) – all weigh in favor of an 18-month sentence, followed by supervised release.   Such a sentence will accomplish the goals of § 3553(a) and serve as a vital reminder that January 6, 2021, represented a violent threat to the democratic process.   *See Munchel*, 991 F.3d at 1284.

## <u>CONCLUSION</u>

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 18 months, which is the mid-point of the Guidelines range as calculated by the U.S. Probation Office and as agreed upon by the parties in the plea agreement.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY

BY:    */s/  Mona Sedky*
Mona Sedky
Special Assistant United States Attorney
D.C. Bar No. 447968
555 4th Street, N.W., Rm. 4842
Washington, D.C. 20530
(202) 262-7122
Mona.Sedky2@usdoj.gov, Mona.Sedky@usdoj.gov