**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 21-CR-00188-RDM |
| | ) | |
| PAUL ALLARD HODGKINS | ) | |
| | ) | |
| Defendant. | ) | |

<u>**MOTION FOR EARLY TERMINATION OF SUPERVISED RELEASE**</u>

Mr. PAUL ALLARD HODGKINS by and through undersigned counsel hereby respectfully moves the Court to order early termination of his supervised release pursuant to 18 U.S.C. § 3583(e)(1), for a termination date of January 13, 2024. The Probation Supervisory Officer indicated that agency policy is for the Court to request the agency's input and it takes no position prior to that time other than to say Mr. Hodgkins has been fully compliant with his release conditions and is eligible to ask for early termination of supervised release. The government opposes. Mr. Hodgkins requests that the Court issue a minute order setting the government response by January 5, 2024 given its immediately stated position of opposition; where Mr. Hodgkins can reply by January 8, 2024; and for a remote video hearing as required by the Court by January 13, 2024. He provides the following in support:

**I.     BACKGROUND/FACTS**

Mr. Hodgkins entered the U.S. Capitol on January 6, 2021 for approximately 25 minutes, after the members of Congress had been escorted out. The Senate West Wing door was open and unguarded when he entered the building behind others. He never crossed a police line. He did not witness anyone fighting with police, nor did he see any law enforcement for that matter,

prior to his entry. He was not shot at or sprayed with chemical agents. He was unaware chemical agents were used or that protestors and police had clashed elsewhere when he entered.

Upon moving with the crowd flow after entry inside the building, Mr. Hodgkins came to a stairway where a law enforcement officer moved aside to allow him to proceed. He did not know he was entering the Senate chamber. He removed the goggles that he had worn on the march as eye protection from the cold and Antifa, whose members had a reputation for using acid and mace to attack people. He never put the goggles back on. He took a selfie. He encountered Joshua Black who apparently had a rubber bullet embedded in his cheek. Mr. Hodgkins always carried a medical kit in the backpack that he had hastily packed for the trip to Washington, D.C. Given work with heavy equipment that could be dangerous, along with the possibility of needing to secure items in his truck, he always kept the medical kit and a small piece of rope in his backpack that he did not empty prior to travel. Despite government narratives, his backpack items had no nefarious purpose outside of their intended ordinary use.

Mr. Black appeared to need aid, so Mr. Hodgkins donned his first aid kit's gloves, and attempted to help the bleeding Mr. Black - a stranger to Mr. Hodgkins. Mr. Black declined aid. Mr. Hodgkins did not take any papers or objects. He did not damage anything. He did not speak any words to incite anyone to violence. He was never violent. Mr. Hodgkins joined in a prayer with those who had entered the Senate chamber and were overseen by U.S. Capitol Police (USCP). When additional law enforcement officers arrived and told everyone to depart, Mr. Hodgkins immediately complied.

Mr. Hodgkins exited the building on the east side as directed by USCP. He made no social media posts, although he sent by private text to approximately five people the selfie he

took inside the Senate. Paul Hodgkins had no criminal history prior to January 6, 2021, and no history of violence. After Paul was advised by his attorney at the time that he was guilty of Section 1512(c)(2) because he had entered the U.S. Senate chamber, he pled guilty to accept responsibility. He never intended to violate any law and expressed his remorse at having done so. Mr. Hodgkins was also sorry for the shame he caused to himself and the family and friends who stayed by his side. He lost his job and benefits, and then had to find temporary work - at a rate slightly above minimum wage - for the period while he awaited self-surrender. His pastor's letter at the exhibit confirms Mr. Hodgkins' sincere remorse for any law that he violated, and where he was and remains a good person who adds value to his community.

## PROCEDURAL HISTORY

Mr. Hodgkins' pled guilty to the serious felony charge of 18 U.S.C. § 1512(c)(2) on June 2, 2021. Minute Entry June 2, 2021 for Plea Agreement Hearing and Plea Agreement and Statement of the Offense at ECF Nos. 22 - 23. He had otherwise been charged with misdemeanors for being on the grounds. He was sentenced on July 19, 2021 where he was ordered to serve eight months in federal prison followed by a term of two years of supervised release. Judgment Order at ECF No. 37. He was allowed to self-surrender. *Id*.  His supervised release began on April 14, 2022 and is scheduled to end on April 13, 2024. His request to end supervised release on January 13, 2024 is a request for a reduction of three months of the supervised release sentence.

## II.   LEGAL STANDARD

There are three requisite criteria for early termination of supervised release under 18 U.S.C. § 3583(e)(1): (1) the defendant has served more than one year of supervised release; (2) early termination is both "warranted by the conduct of the defendant" and in "the interest of justice," and (3) analysis of the certain factors set forth in 18 U.S.C. § 3553(a) supports the early termination.

"In the Sentencing Reform Act of 1984, § 212(a)(2), 98 Stat. 1999, Congress eliminated most forms of parole in favor of supervised release, a form of post-confinement monitoring overseen by the sentencing court, rather than the Parole Commission." *Johnson v. United States*, 529 U.S. 694, 696-97 (2000). See *Gozlon-Peretz* v. *United States*, 498 U.S. 395, 400-401 (1991). Congress established the system of supervised release to encourage rehabilitation after the completion of a prison term and does not replace a portion of a prison term. United States Sentencing Commission (USSC) Guidelines Manual Ch. 7, Pt. A(2)(b) (Nov. 2020)).

Pursuant to 18 U.S.C. § 3583(e)(1) the court may, "after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7) . . . terminate a term of supervised release and discharge the defendant released at any time after the expiration of one year of supervised release . . . if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice." *U.S. v. Ayers*; 1:10-cr-00171-JDB ECF No. 378 at 3; Filed 06/14/23, ((Citing to § 3583(e)(1) and *United States v. Etheridge*, 999 F. Supp. 2d 192, 195 (D.D.C. 2013)).

The § 3553(a) factors for the Court to consider under 18 U.S.C. § 3583(e)(1) are:

> (1) the nature and circumstances of the offense and the defendant's history and characteristics;
> (2) the need for the sentence imposed
>   (B) to afford adequate deterrence to criminal conduct;
>   (C) to protect the public from further crimes of the defendant; and
>   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (4) the kinds of sentence and the sentencing range established
> (5) any pertinent policy statement (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28 . . . .
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1); (a)(2)(B)-(D); (a)(4)-(7).

Whether to grant a motion to terminate a term of supervised release is a matter completely at the discretion of the Court. *Rhodes v. Judisak*, 676 F.3d 931, 933 (10th Cir. 2011).  The Court has broad discretion is ascertaining whether conduct of the released person warrants early termination and is in the interests of justice. *United States v. Hook*, 471 F.3d 766, 771 (7th Cir. 2006).

Pursuant to Judiciary Policy, <u>there is a presumption in favor of recommending early termination for supervised releasees after 18 months of supervision for offenders who</u>:

> (A) are not career violent and/or drug offenders (as described in 28 U.S.C. § 994(h)), sex offenders, or terrorists,
> (B) present no identified risk to the public or victims, and
> (C) are free from any moderate (see: Guide, Vol 8E, § 620.40.20) or high (see: § 620.40.30) severity violations.

Guide to Judiciary Policy, Vol. 8 Part E, Chapter 3, § 360.20 ((Probation and Pretrial Services, (Post-Conviction Supervision)).

Under the section "Early Termination," the Guide to Judiciary Policy also provides criteria for the Probation Services Agency and supervising officers to assess whether a

statutorily eligible offender should be recommended to the court as an appropriate candidate

for early termination. These criteria are:

> (1) The person does not meet the criteria of a career drug offender or career
>   (as described in 28 U.S.C. § 994(h)) or has not committed a sex offense or
>   engaged in terrorism;
> (2) The person presents no identified risk of harm to the public or victim;
> (3) The person is free from any court-reported violations over a 12-month
>   period;
> (4) The person demonstrates the ability to lawfully self-manage beyond the
>   period of supervision;
> (5) The person is in substantial compliance with all conditions of supervision;
>   and
> (6) The person engaged in appropriate prosocial activities and receives
>   sufficient prosocial support to remain lawful well beyond the period of
>   supervision.

2018 Guide to Judiciary Policy, Vol. 8 Part E, Chapter 3, § 360.20(c)(1)-(6), ((Probation
and Pretrial Services, (Post-Conviction Supervision)).

For its decision on supervised release, a district court must explain its consideration of

the relevant § 3553(a) factors, unless "clear and compelling reasons to deny relief leap out

from the record." 1:10-cr-00171-JDB ECF No. 378 at 3. ((Quoting *United States v. Mathis-

Gardner*, 783 F.3d 1286, 1288–89 (D.C. Cir. 2015)).

There is no statutory requirement for the Court to require *exceptional* or *extraordinary*

conduct. "[E]xceptional behavior is a requirement nowhere to be found." *United States v.

Raymond*, Criminal Action No. 09-183 (RMC), at *7 (D.D.C. Apr. 25, 2019). "[C]onstruing

§ 3583(e)(1) to require the defendant to exhibit objectively extraordinary or unusual conduct

during supervision is a stretch not expressed in the statutory text." *United States v. Harris*, 258

F. Supp. 3d 137, 149-50 (D.D.C. 2017). The 2nd Circuit's *Lussier* case appears to have been

the genesis for the trend to require more than being in full compliance with release conditions

and integrating with society, even for years, to meet conduct requirements. The Second Circuit

clarified that the holding in *United States v. Lussier,* 104 F.3d 32 (2d Cir.1997) <u>was not a requirement</u> for new or changed circumstances relating to the defendant, and "that changed circumstances *may* in some instances justify a modification." *United States v. Ponce*, 22 F.4th 1045, 1047 (9th Cir. 2022). *See United States v. Parisi* , 821 F.3d 343, 347 (2d Cir. 2016).

## III.   DISCUSSION/ARGUMENT

Because Mr. Hodgkins has been on supervised release for twenty months, he is eligible for early termination of supervised release under 18 U.S.C. § 3583(e)(1). He will have been on supervised release for twenty-one months, or 88% of the term, by his requested termination date of January 13, 2024. Mr. Hodgkins served his prison sentence and has conducted himself lawfully while meeting all release conditions for the past twenty months. Mr. Hodgkins crossed all bridges to integration with his community and society. Analysis shows that there is no further rehabilitation to be found in the last three months of  his sentence of supervised release. He comes to this Court now for early termination because he will be precluded from completing registration to vote in the Florida Presidential Preference Primary (PPP) by the February 20, 2024 deadline if his supervised release continues. He will then be precluded from voting in the March 19, 2024 Florida PPP. He already missed the ability to vote in local elections since 2022. For the aim of community integration, voting ability is key since it is allowed for felons in Florida. And, whether to support voter registration efforts or work as a volunteer for events, he is persona non grata when not registered to vote and still on a term of his felony sentence. It is in the interests of justice to allow Mr. Hodgkins to vote and to volunteer civic time to his community in support of both the U.S. and Florida Constitutions.

This Court has broad discretion in determining release based upon Mr. Hodgkins' conduct and the interests of justice. *Hook*, 471 F.3d at 771. His conduct has been exceptional where he maintained a stable residence and employment since release from prison as a convicted felon, which was and is not an easy feat. Mr. Hodgkins is integrated in his community and church. He is well along in establishing the papaya tree and fruit business that he started from seeds upon release from prison, where since the spring and summer of 2022 he now has nearly 200 viable trees to plant in an orchard. He is creating his expansion business plan, and saving to buy or lease enough land for an orchard. Paul maintains a healthy lifestyle and associates with others who do, as evidenced by his training for and participation in *Spartan*™ obstacle course races that are associated with the American Cancer Association.

Because Paul is eligible for early termination of supervised release and his conduct shows that he is rehabilitated by all measures, it is in the interests of justice to not deny the fundamental right to vote after he completed his prison time. See 18 U.S.C. § 3583(e)(1).

The purpose of the supervision must be considered. Supervised release follows imprisonment, where it "serves an entirely different purpose than the sentence imposed under § 3553(a)." *Pepper v. U.S.*, 562 U.S. 476, 502 n.15 (2011).

> Supervised release fulfills rehabilitative ends, distinct from those served by incarceration. See § 3553(a)(2)(D); United States Sentencing Commission, Guidelines Manual §§ 5D1.3(c), (d), (e) (Nov. 1998); see also S. Rep. No. 98-225, p. 124 (1983) (declaring that "the primary goal [of supervised release] is to ease the defendant's transition into the community after the service of a long prison term for a particularly serious offense, or to provide rehabilitation to a defendant who has spent a fairly short period in prison for punishment or other purposes but still needs supervision and training programs after release").

*U.S. v. Johnson*, 529 U.S. at 59.

Consideration for early release from supervision and the imposed conditions include assessments of the likelihood of recidivism for the particular individual given *their* crime, *their* history, and *their* progress. Using supervised release as "punishment" is not a goal anywhere for evaluation under § 3553(a)  factors, which are "consequently, evaluated mindful of the Supreme Court's clear articulation of the purpose of supervised release and the district court's discretion to limit terms of supervised release to those who need it."  *United States v. Moore*, Criminal Action No. 01-238 (BAH), at *6 (D.D.C. Jan. 28, 2020)(quoting *Harris*, 258 F. Supp. 3d at 145). The Court should consider that in Mr. Hodgkins' case, there is no likelihood of recidivism. If used as punishment here to Mr. Hodgkins, continued supervision will involve denial of a fundamental right given that he is rehabilitated and transitioned into the community. Mr. Hodgkins has achieved the goals of supervised release, and his motion should be granted because otherwise it is counter to the interests of justice to deny Mr. Hodgkins the right to vote again this year after he served his prison time for obstructing Congress's Electoral Vote count. His conduct and the interests of justice under 18 U.S.C. § 3583(e)(1) support his request.

### A.  Mr. Hodgkins Meets Eligibility Standards for Early Termination of Supervised Release.

He served more than one year of supervised release and fully complied with all release conditions. In the Probation Services' recommendation, Mr. Hodgkins should be afforded a presumption of early termination because he has served over eighteen months of supervision, he will have only three months remaining, and he meets the published assessment criteria.

**B. Early Termination Is Both Warranted by Mr. Hodgkins' Conduct and in the Interests of Justice**

Mr. Hodgkins' commitment to securing and maintaining gainful employment after release from prison during a period of high inflation and layoffs; his continued participation in his church community; his fitness regimen and participation in Spartan™ ten-kilometer obstacle course races where he surrounds himself with people with healthy lifestyles; and his ongoing entrepreneurial endeavor where he grew 200 papaya trees starting from seed to 7-feet height, and is planning for an orchard, show by conduct that he is a productive and self-motivated community member. Mr. Hodgkins' compliance with the terms of his release, the rapid completion of his payment upon release of his obligation to the Court and his restitution, his steady employment, and his hard labor in preparing his startup business are exceptional in the totality of circumstances view, even though *exceptional conduct* and achievement in the face of adversity is not a required metric. Paul's conduct demonstrated rehabilitation and reintegration into the community that do not require further administration of supervised release.

Reducing his supervised release by three months is in the interests of justice. It allows him to regain voting rights and then be part of democracy. It will allow him to expand his civic volunteer efforts. It will allow him to proceed further with his business expansion plan that may require financing applications that he cannot do now on his own under supervision. His original sentence showed that he was not considered to require maximum punishment under the U.S. Sentencing Guidelines ("USSG" or "Guidelines"). He was allowed to remain on bond after arrest and his plea conviction; and was then allowed at sentencing to self-surrender for prison. Mr. Hodgkins took responsibility for his one-time offense when told by his previous

attorney that he was guilty of Section 1512(c)(2). He was never considered a danger to anyone, and nor does he now present any danger to anyone or any group.

**C.  Examination of the Relevant § 3553(a) Factors Required by § 3583(e) Shows That the Court Should Order Early Termination of Mr. Hodgkins' Supervised Release.**

**(1) <u>The nature and circumstances of the offense and Mr. Hodgkins' history and characteristics favor early termination</u>:**

Mr. Hodgkins pled guilty to the serious felony of 18 U.S.C. Section 1512(c)(2). Two years of supervised release was ordered for his conviction for that felony. There were no aggravating factors or sentence enhancements. Paul traveled by bus to Washington, D.C. and was not involved with any group activity. He attended the rally at the Ellipse and then joined the march to the U.S. Capitol. He did not witness any violent clashes between police and protestors, and was completely peaceful. He did not threaten or assault anyone, or cause any property damage. He did not glorify anything about January 6, 2021 on social media. Mr. Hodgkins did not use or post anything to social media. When the FBI sought to question him before bringing any charges, he cooperated. In agreeing to the plea agreement and at sentencing, he accepted responsibility for going in the building and in the Senate chamber. He was sincerely remorseful for violating any law.[1]

As to Mr. Hodgkins' history, prior to his conviction in this case he had no prior criminal history. He worked in a variety of jobs before settling in Tampa, Florida, where he was respected at work for his performance as a crane operator. He lost his promotion and steady employment after his sentencing. During the period prior to his self-surrender to prison, despite

---

[1] It is noteworthy that the application of 18 U.S.C. Section 1512(c)(2), for "Obstruction of Congress," was just accepted within the past few days on a writ of certiorari by the United Stated Supreme Court.

the notoriety of his case locally and nationally, he found lower wage temporary work, and continued to support himself. He has worked and supported himself since being placed on supervised release, which is to his credit since doing this is not easy for convicted felons. He endeavored to start a papaya tree and fruit business while working to support himself. He maintains a modest lifestyle while saving to fully implement his business. He is a valued member of his church community. See Exhibit.

He served his prison time without incident, volunteered for suicide watch training and monitoring for vulnerable inmates, and upon release complied with all release conditions. He took up a significant physical fitness training regimen to compete in "Spartan Races" with the American Cancer Society sponsor. His races are off-road, with 10 kilometer distances that involve 25 obstacles. The obstacles vary from climbing, carrying sandbags, traversing mud, crossing water, and other creative challenges to completing the course in addition to running. With some out of the district and the state, his Supervisory Officer has allowed him to travel.

Because of his acceptance of responsibility, lack of criminal history, and continuous movement forward as a law-abiding, responsible citizen, where supervised release has met its goal, this factor weighs in Mr. Hodgkins' favor for early termination of supervised release.

### (2) Deterrence of criminal conduct and (3) Protection of the public from further crimes of the defendant favor early termination:

The section on providing the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner is not applicable in

this case. Mr. Hodgkins did not require any post-prison programs, such as those for drug addiction or sex offenders.[2]

Mr. Hodgkins' case received significant media coverage because it was an early (and first felony) sentencing. The publicity served as a deterrent nationally. Paul served his prison time, will continue to obey the law, and never wants to return to any prison. He will have served 88% of his term of supervised release if the Court orders termination for January 13, 2024. Reducing the supervised release term by three months will not change the fact that Mr. Hodgkins has been adequately reintegrated in the community, and deterred in the future from entering any building or place without authority. Mr. Hodgkins' steady employment since he was released from prison "is correlated with a reduced likelihood of recidivism." *U.S.A. v. Ayers*; 1:08-cr-00364-JDB ECF No. 143 at 5 (06/21/23) ((citing to *United States v. Harris*, 258 F. Supp. 3d 137, 146–47 (D.D.C. 2017)).

His exceptional effort to start a papaya business where he grew approximately 200 trees from seeds has been a labor of learning, manual work, and love of nature. Paul is not going to risk his business that is ready to blossom as he moves toward buying or leasing land and establishing an orchard.  The exhibit shows just a few of his trees, where his plans include travel to learn more about successful orchard businesses. He needs to ensure he has good credit for business establishment purposes. His reputation will be important. Mr. Hodgkins is serious about never violating the law and being able to work his way into the middle class in the near future, rather than living paycheck to paycheck, especially given inflation.

---

[2] The section could be viewed in his favor given a history where programs were unnecessary.

Despite the characterization of January 6, 2021 as an "insurrection" (with nobody charged with that crime), Mr. Hodgkins is no danger to the public. He remains 100% in support of the voting process under democracy. The Electoral Count had been suspended before he entered the U.S. Capitol. He left immediately when ordered to do so. Paul was never violent.

For voting in the Florida PPP, Mr. Hodgkins needs the time from mid-January to February 19, 2024 to ensure his voter registration is accepted. While it is supposed to be automatic, there is still a county review process for his reinstatement onto the Florida voter rolls. Because incarceration and supervision have afforded adequate deterrence, where Mr. Hodgkins' conduct demonstrates that the goal of supervision has been met, the Court should grant his Motion. Mr. Hodgkins respectfully asks that based on his conduct and in the interests of justice, he be allowed to participate in the process of democracy where an order of early termination of supervised release allows him to register in February and vote in March 2024.

**(4)  The kinds of sentence and the sentencing range established in the Guidelines favor termination of his supervised release.**

Mr. Hodgkins came forward to accept responsibility very early, and the Court recognized that at sentencing where it varied downward from fifteen months at the Guidelines low end to order eight months for prison time. The Court considered his lack of criminal history, work history, and peaceful nature on January 6, 2021, when instead of sentencing him to the Guidelines' maximum of three years' supervised release, it sentenced him to two years. There are no comparable cases to compare to since Mr. Hodgkins may be the first January 6th defendant to request early termination of his supervised release. Further, the DOJ's published data does not allow an "apples to apples" comparison as discussed in (6) below.

This District has granted early termination of supervised release to serious offenders, such as drug dealers, based on the person showing rehabilitation and reintegration into their community where the risk of recidivism is low. Here, social reintegration except for voting is complete, and there is no risk of recidivism where Mr. Hodgkins would enter the U.S. Capitol during the Electoral Count, or without authority, ever in the future.

**(5) The factor for any pertinent policy statement issued by the Sentencing Commission is not applicable since <u>no policy statement has been issued for this topic</u>.**

**(6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct is in Mr. Hodgkins' favor.**

Mr. Hodgkins did not have co-defendants for sentencing comparison for January 6, 2021. DOJ does not provide any organized data showing charges dismissed or acquitted. Other defendants cannot be assessed as similarly situated because the sentencing table information provided by the DOJ does not show all the crimes charged for every defendant - just the convicted charges. The tables do not show criminal history of other defendants.

But it is fact that in other cases, the DOJ agreed to dismiss the Section 1512 charge and offer a misdemeanor plea deal even when defendants had made posts on social media, or loudly demonstrated. At least one other defendant who entered the Senate chamber was offered a misdemeanor plea deal where six months in prison and one year of supervised release was the maximum sentence available for zero criminal history points. For supervised release for Section 1512 convictions, sentences vary from one year to three years.

Plea deals have to be researched based on running across a news story or otherwise knowing about the case. Some plea deals have been sealed. For example, there are sealed pleas for defendants who carried firearms on the Capitol grounds where their maximum prison

sentence will be six months. There is no list that shows who was charged with Section 1512 for similar conduct of entering the U.S. Capitol; or those defendants whose Section 1512 charges were dismissed for pleas to a misdemeanor. For the majority of those who pled guilty for similar conduct, but were offered pleas to a lesser charge, their pleas were to misdemeanors with a maximum of one year supervised release. Thus, for the same conduct, there already is a disparity. In a number of cases, the DOJ dismissed the section 1512 charge - even for conduct of entry into the Senate chamber.

Comparisons with those convicted of 1512 remain difficult. Many who pled guilty to Section 1512 had other serious offenses, such as assault, related to their conduct on January 6th that is distinguished from Mr. Hodgkins' peaceful nature that day. Many who were convicted at trial of Section 1512 had other felonies for which they were also convicted. Given the DOJ sentencing table, and the variety of undisclosed variables, there cannot be any disparity claim about sentencing if Mr. Hodgkins upon granting this instant motion for three months' early termination of supervised release.

It is fair and in the interests of justice to reduce Mr. Hodgkins' supervised release by the three months he requests since others who by available information were somewhat similarly situated and were offered plea deals without the Section 1512 charge, received supervision for less time. Then others convicted of Section 1512 received one year of supervised release compared to Mr. Hodgkins' two years. Because there were no co-defendants convicted of the same conduct in Mr. Hodgkins' case, and where distinct conduct and defendants' histories apply in other cases, the reduction of three months of supervised release as requested in the instant Motion cannot create a sentencing disparity, either actual or perceived.

**(7)  The need to provide restitution to any victims of the offense favors granting the motion**:

There was no human victim of Mr. Hodgkins' offense, and he did not directly or proximately cause any property damage to the U.S. Capitol. The government demanded restitution of $2000.00 as part of the plea agreement. Mr. Hodgkins started paying off the restitution while in prison from his commissary fund donations. Shortly after being placed on supervised release, he completed payment. He also paid the $200 court assessment. He has no remaining restitution since he paid everything.

The relevant Section 3553(a) factors, taken together in a totality of the circumstances view, support three months' worth of early termination of supervised release even though Mr. Hodgkins pled guilty to the serious offense of Section 1512. There are no indicia that support continuance of supervised release for the purposes of re-entry to the community, rehabilitation, deterrence, or protection of the public. There are no contravening facts based on Mr. Hodgkins' history, conduct, current activity, or current productivity to indicate that he requires continuing supervision to abide by the law or be part of his community.

## IV.  CONCLUSION

Because Mr. Hodgkins' conduct evinces a person who has been rehabilitated and is transitioned into society as a law-abiding citizen who has no further need for supervision, and in the interests of justice he should be allowed to register to vote in February 2024 where he can ensure his application is timely processed by his county, termination of supervised release is warranted based on his conduct and in the interests of justice under 18 U.S.C. § 3583(e)(1).

**WHEREFORE**, PAUL ALLARD HODGKINS respectfully requests that the Court set a schedule for the government response by January 5, 2024 since the government without pause opposed this motion when asked its position; for Mr. Hodgkins to reply by January 8, 2024 to any government opposition response, and for a remote, virtual hearing on the motion by January 13, 2024; and to grant this motion as proposed in the attached order.


December 23, 2023                         Respectfully submitted,

                                          /s/ *Carolyn A. Stewart*
                                          Carolyn A. Stewart, Esq.
                                          Defense Attorney  D.D.C. Bar No. FL0098
                                          Stewart Country Law PA
                                          1204 Swilley Rd.
                                          Plant City, FL 33567
                                          Tel: (813) 659-5178
                                          Email: Carolstewart_esq@protonmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of DECEMBER 2023, a copy of the foregoing

was served upon all parties as forwarded through the Electronic Case Filing (ECF) System.

<u>/s/ Carolyn Stewart</u>
Carolyn Stewart, Esq.