UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | Case No. 1:21-cr-188 (RDM) |
| | : | |
| **PAUL HODGKINS,** | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR EARLY TERMINATION OF SUPERVISED RELEASE

The United States of America, by and through its counsel, the United States Attorney for the District of Columbia, respectfully submits this Memorandum in Opposition to the Defendant's Motion for Early Termination of Supervised Release, Dkt. 53. With no sense of irony, defendant Paul Hodgkins, who pleaded guilty to felony obstruction by intentionally disrupting the vote count in the 2020 Presidential election, now moves for early termination of his supervised release specifically so that he can vote in the March 2024 Florida primary. Dkt. 53 at p. 7. As set forth below, in light of the 18 U.S.C. § 3553(a) factors, the defendant's conduct, and the interests of justice, early termination of Hodgkins' supervised release is not warranted. Hodgkins engaged in extremely serious offense conduct—purposefully obstructing the peaceful transition of power on January 6. He then engaged in disturbing post-sentencing conduct that shows a lack of remorse and acceptance of responsibility for that criminal conduct. Hodgkins now seriously minimizes and mischaracterizes his offense conduct in the instant motion, which again further demonstrates his lack of remorse and acceptance of responsibility. Finally, a defendant's post-conviction place of residence and that state's associated voter eligibility rules have nothing to do with the seriousness of the offense, the defendant's characteristics, the need for deterrence, or any other § 3553 factor, and terminating supervised release to allow voting would automatically generate unwarranted and

arbitrary disparities among similarly situated defendants based solely on their post-conviction residence. In short, after receiving a sentence well below the recommended United States Sentencing Guidelines range, Hodgkins, through his continued failure to accept responsibility for his serious crimes, has demonstrated a heightened risk of recidivism and, in turn, the need for continued, not shortened, supervised release.

After consultation, the United States Probation Office in the District of Columbia stated that it, too, does not support Hodgkins' motion for early termination, in light of the seriousness of Hodgkins' offense conduct, Hodgkins' post-sentencing conduct, and his characterization of his criminal conduct in the instant motion. Accordingly, the defendant's motion should be denied.

I. <u>Background</u>

    A. <u>Hodgkins' Offense Conduct, Guilty Plea, and Sentencing</u>

On January 6, 2021, Hodgkins participated in the assault on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars of property damage. For his part, at approximately 2:50 p.m. on January 6, Hodgkins entered the U.S. Capitol, after having traveled to Washington, D.C., by bus from Tampa, Florida, and attended the rally at the Ellipse. Hodgkins came to the U.S. Capitol prepared for physical confrontation---he carried with him a backpack that had, among other items, protective eye goggles, rope, and white latex gloves. At approximately 3:00 p.m. Hodgkins entered the Senate chamber, where, a short while earlier, the Vice President had been presiding before being forced to evacuate. As Hodgkins walked among the Senators' desks, he removed the goggles he had donned, took "selfie-style" photographs with his cell phone, and put on and then removed his white latex gloves. Hodgkins

walked down to the Senate well, where he stood adjacent to an elevated desk and platform. A few feet away, standing on the platform, several other rioters were shouting, praying, and commanding the attention of others in the Senate chamber. One of those individuals was shirtless, wearing face paint, and using a bullhorn to speak. Hodgkins remained standing with them while they continued to shout, cheer, and say prayers using the bullhorn. Finally, Hodgkins raised his "Trump 2020" flag in salute. At approximately 3:15 p.m. Hodgkins exited the Senate chamber and the U.S. Capitol. Dkt. 23, Statement of Offense; PSR at ¶¶ 10-19. *See also* Government's Sentencing Memorandum, Dkt. 32.

As Hodgkins later admitted, he knew that he did not have permission to enter the Capitol building, and he acted with the intent to corruptly obstruct, influence, and impede an official proceeding, that is, Congress's certification of the Electoral College vote. Dkt. 23, Statement of Offense; PSR at ¶¶ 10-19. Hodgkins admitted that he committed his crimes in the midst of a violent mob attack on the U.S. Capitol. This attack featured individuals who forced their way through, up, and over the barricades and officers of the U.S. Capitol Police, who forced entry through locked doors, windows, and police lines, and who repeatedly assaulted law enforcement officers. Dkt. 23, Statement of Offense.

Hodgkins was arrested by complaint on February 16, 2021. Dkt. 1, 5. On March 5, 2021, a five-count indictment was returned, charging him with violating 18 U.S.C. §§ 1512(c)(2), 2; 18 U.S.C. §§1752(a)(1) and (2); and 40 U.S.C. §§ 5104(e)(2)(D), (G). Dkt. 11. On June 2, 2021, pursuant to a written plea agreement, the defendant pled guilty to a single felony count of violating 18 U.S.C. § 1512(c)(2). Dkt. 22, 23.

Hodgkins was sentenced by this Court on July 19, 2021. Dkt. 36. This Court determined that Hodgkins' U.S. Sentencing Guidelines range was 15-21 months and granted a substantial

downward variance under the 18 U.S.C. § 3553(a) factors, sentencing Hodgkins to a term of eight months in custody. This was below the government's 18-month recommendation and U.S. Probation's recommendation. Minute Entry July 19, 2021. But, as the Court noted at the time, this variance was also supported by Hodgkins' extremely early acceptance of responsibility – Hodgkins was one of the first January 6 defendants to plead guilty to, and be sentenced for, a felony offense. This Court sentenced Hodgkins to two years' supervised release, below the government's three-year recommendation. Dkt. 36 at p. 13 (Transcript of Sentencing Hearing).

B. Hodgkins' Post-Sentencing Conduct

Shortly after Hodgkins was sentenced and after his return to Tampa to await his self-surrender, he tried to unwind his plea agreement. For example, through new counsel, in August 2021, Hodgkins filed a motion to file an (untimely) notice of appeal and a motion to delay self-reporting to assist with his filing of an ineffective assistance of counsel claim. Dkt. 40, 47. Despite having stated under oath during his plea colloquy that he had signed his plea agreement (*See* Dkt. 41, Transcript of Video Plea Hearing, pp. 20-21), Hodgkins separately made wholly unsubstantiated challenges to the authenticity and validity of his signature. *See* Dkt. 40. Hodgkins ultimately changed course and filed neither an appeal nor an ineffective assistance of counsel claim.[1]

---

[1] In addition, in May 2022, a few weeks after Hodgkins was released from custody, U.S. Probation reprimanded Hodgkins and notified the Court about his potential violation of the term of his supervised released that restricts his associating with known felons. *See* Dkt. 23 p. 4 ¶ 8 (Final Judgment) and Dkt. 51. Hodgkins had attended an event with a well-known convicted felon and posed for photographs with that person. That individual then uploaded one of the photographs to his social media account. Dkt. 51. Hodgkins later told the Court that he was unaware that the person was a felon. Yet even a cursory internet search reveals the individual's Wikipedia page, which identifies him as a convicted fraudster who has filed over 2600 bogus lawsuits and impersonated a Sandy Hook victim. While the Court understandably declined to take action, the idea that the defendant had no idea that he was appearing with someone with such a troubling and public past seems to belie ignorance, and even if credited, suggests that the defendant still needs

In Hodgkins' instant motion, Hodgkins seriously minimizes and mischaracterizes his offense conduct. Hodgkins claims that he "did not see any law enforcement," was "unaware . . . that protesters and police had clashed elsewhere," "did not know he was entering the Senate Chamber," and "never intended to violate any law." Dkt. 53 at pp. 1-3. This not only contradicts his sworn Statement of Offense and plea colloquy, it calls into serious question Hodgkins' candor with the Court and his acceptance of responsibility.  Hodgkins walked past downed barricades and broken glass. He would have smelled smoke and tear gas and heard the blaring sirens. He could not have escaped seeing protesters clash with law enforcement officers. These statements, in and of themselves, underscore the need for his continued deterrence and supervision. Hodgkins' assertions contradict his sworn plea of guilty, making his candor and acceptance of responsibility suspect, further underscoring a continued need for deterrence and supervision.  His repeated back-tracking supports his need for continued, not truncated, supervision.

II. <u>Argument</u>

    A. <u>Early Termination Standard</u>

Pursuant to 18 U.S.C. § 3583(e)(1), a court has discretion to terminate a term of supervised release at any time "if it is satisfied that such action is warranted by the conduct of the defendant and the interest of justice." 18 U.S.C. § 3583(e)(1). In making this determination, the Court must consider the factors set forth in 18 U.S.C. § 3553(a), to the extent they are applicable. *Id.*; *see also United States v. Hartley*, 34 F.4th 919 (10th Cir. 2022) (holding that a district court must make individualized determinations based on the applicable statutory criteria before responding to a request to modify a sentence); *cf. United States v. Ferrell,* 234 F.Supp.3d 61, 63 (D.D.C. 2017)

---

appropriate guidance and development through supervised release to help make better judgments and understand the rules of the road.

(same holding for considering early termination in felony case). Although "extraordinary circumstances . . . are not necessary for such termination," they "may be sufficient to justify early termination of a term of supervised release." *United States v. Melvin*, 978 F.3d 49, 53 (3d Cir. 2020).

Courts have routinely held that model, post-incarceration conduct and unblemished compliance with the terms of supervised release, standing alone, are insufficient to warrant early termination of supervised release. *See, e.g.*, *United States v. Longerbeam*, 199 F.Supp.3d 1, 2–3 (D.D.C. 2016) (holding that "while the Court commends defendant for his law-abiding conduct and personal successes, such activities are expected of a person on supervised release" and do not amount to "exceptionally good behavior" and noting that, in this circuit, either "changed circumstances" or "something of an unusual or extraordinary nature in addition to full compliance" is needed to justify early termination of supervised release because otherwise the exception would "swallow the rule.") (citing *United States v. Mathis–Gardner*, 783 F.3d 1286, 1288 (D.C. Cir. 2015), *United States v. Lussier*, 104 F.3d 32, 32 (2d Cir. 1997) and *United States v. Etheridge*, 999 F.Supp.2d 192 (D.D.C. 2013)). *See also Mathis–Gardner*, 110 F.Supp.3d at 93–94 (noting that courts "have found that mere compliance with the conditions of release is not enough to merit early termination of supervised release because model prison conduct and full compliance with the terms of supervised release is what is expected of a person under the magnifying glass of supervised release" and holding that, in spite of the defendant's argument that she had taken dramatic steps to give back to her community since her release from prison, early termination was not in the interest of justice based on the need for supervised release to serve as punishment and a general deterrent.) (quotations omitted). *Accord United States v. Cymerman*, 15-cr-179 (RC), 2023 WL 8005095 (D.D.C. Nov. 17, 2023) (denying motion for early termination of defendant's 120-month

6

supervised release term, reasoning in part that full compliance with terms of supervised release "is 'expected of a person on supervised release,' and courts have denied motions for early termination despite 'law abiding personal success.'")(quoting *Longerbeam*, 199 F.Supp. 3d at 2-3)).

In the helpful context of probation in misdemeanor cases, courts have routinely held that mere compliance with the conditions of probation, without more, does not warrant early termination. *See e.g.*, *United States v. Suarez*, 21-cr-205 (DLF), 11/9/23 Minute Entry ("As courts in this district have previously held, 'good behavior alone' is generally 'insufficient to warrant early termination' of probation.") (citing *United States v. Parker*, 219 F. Supp. 3d 183, 191 (D.D.C. 2016)); *United States v. Salazar*, 693 F. App'x 565, 566 (9th Cir. 2017) (affirming denial of motion to modify conditions of probation where "the magistrate judge applied the correct legal standard when she considered the 18 U.S.C. § 3553(a) factors and determined that Salazar's mere compliance with the conditions of probation, without more, did not warrant early termination"); *United States v. Rusin*, 105 F. Supp. 3d 291, 292 (S.D.N.Y. 2015) (stating that full compliance with probation conditions is what is expected of defendants and "[e]arly termination is not warranted where a defendant did nothing more than that which he was required to do by law."). In *Suarez*, the Court properly noted that the defendant's conduct – participation in the riot on January 6, 2021 – was sufficiently serious to not warrant early termination in a case involving a single count of a petty offense, 40 U.S.C. § 5104(e)(2)(G). Here, the defendant's conduct is far more serious and involves a felony offense with corrupt intent. The logic of the *Suarez* Court applies even more forcefully in this context.

    B. <u>The Section 3553 Factors, Hodgkins' Conduct, and the Interests of Justice Do Not Support Early Termination of Hodgkins' Supervised Release</u>

Hodgkins argues that he is eligible for early termination because he has been in compliance with his supervision, has had steady employment, and has made the required financial payments.

The gravamen of his argument is that his supervision should be terminated so that he can vote in the March 2024 Florida primary election and participate in other election-related activities. Hodgkins' arguments lack merit.

As noted above, the case law is clear that a defendant's compliance with his supervision, while commendable, is insufficient by itself to justify early termination. Not surprisingly, Hodgkins cites to no authority that supports his contention that a particular state's voting eligibility rules and election calendar impact a defendant's punishment.  It bears noting that, despite his being on supervised release, Hodgkins has been and remains free to engage in political and vote-related civic engagement. That right is critical to our democratic underpinnings. Moreover, assuming his supervised release ends as scheduled in April 2024, it will not prevent him from voting in Florida in the November 2024 general election, assuming he has complied with state law on voter eligibility. The government appreciates the need to safeguard and ensure the voting rights for all eligible Americans, but the defendant's need for meaningful supervision, along with appropriate deterrence, nevertheless remains high. Moreover, termination of supervised release on this basis could also automatically create unwarranted and arbitrary sentencing disparities among similarly situated defendants, where defendants' sentences would depend, in part, on their post-conviction residences and voting cycle calendars.[2]

---

[2] Some states do not disallow the right to vote in the event of a felony conviction. Other states take away such a right while a person is incarcerated and automatically restore it upon release. Some states also remove the right to vote until it is restored through some other process. But terminating supervised release based solely on one's voting rights as it relates to one's post-conviction residence would create different supervised release terms based on a factor that has nothing to do with the nature of the defendant, the offense of conviction, or any other §3553(a) factor.  Defendants with similar characteristics who committed similar offenses could serve different supervised release terms only because of where they reside.  Such a result is not consistent with the statute.

Furthermore, the § 3553(a) factors do not support early termination of supervised release in this case. Early termination of the defendant's probation would fail to take account of the serious nature of Hodgkins' criminal conduct. It would also ignore his troubling post-sentencing behavior. As noted above, Hodgkins, within weeks of being sentenced, initially tried to un-do his plea agreement, in part by making baseless accusations that challenged the validity of his signature on his plea agreement. In his current motion for early termination, Hodgkins minimizes and mischaracterizes his criminal conduct. He does so in direct contravention of the admissions that he made in his plea agreement and that he reaffirmed, under oath, during his plea colloquy. Hodgkins has repeatedly demonstrated a lack of remorse, lack of acceptance of responsibility, lack of candor with the Court, and, accordingly, a heightened risk of recidivism. This in turn establishes the need for continued, not shortened, supervision.

Given the seriousness of the events of January 6, 2021, the functional sentence that the defendant requests here would not reflect the seriousness of the offense, promote respect for the law, or provide just punishment for the offense. *See Suarez*, 11/9/23 Minute Entry. These are serious offenses that were committed during an unprecedented riot that threatened the peaceful transfer of power. Moreover, an early termination of Hodgkins' supervised release will not adequately deter other would-be offenders from engaging in similar conduct in the future. Furthermore, upon information and belief, no other felony defendant has yet been excused from such supervision. Respectfully, this is not the case that warrants such unusual treatment.

III.   Conclusion

For the forgoing reasons, as well as the reasons articulated in the Government's Sentencing Memorandum, Dkt. 32, the government respectfully requests that the Court deny the defendant's Motion for Early Termination of Supervised Release.

Dated:  January 5, 2024

                                              Respectfully submitted,

                                              MATTHEW M. GRAVES  
                                              United States Attorney  
                                              D.C. Bar No. 481052

By:     <u>*/s/ Mona Sedky*</u>  
           Mona Sedky  
           SAUSA/Senior Trial Attorney, U.S. Dept. of  
           Justice Computer Crime & Intellectual  
           Property Section  
           D. C. Bar No. 447968  
           United States Attorney's Office  
           601 D Street NW  
           Washington, D.C. 20001  
           Mona.Sedky@usdoj.gov  
           Phone: 202-262-7122

CERTIFICATE OF SERVICE

I hereby certify that the GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR EARLY TERMINATION OF SUPERVISED RELEASE was duly served upon the defense counsel by electronic means via the Court's ECF system.

This 5th day of January, 2024.

/s/ Mona Sedky
Mona Sedky
SAUSA/U.S. Dept. of Justice Senior Trial Attorney, Computer Crime & Intellectual Property Section
D. C. Bar No. 447968
United States Attorney's Office
601 D Street NW
Washington, D.C. 20001
Mona.Sedky@usdoj.gov
Phone: 202-262-7122